## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LANNAN FOUNDATION,<br><br>313 Read Street<br>Santa Fe, NM 87501<br><br>       Plaintiff,<br><br>  v.<br><br>DENNIS M. GINGOLD,<br><br>8712 Crider Brook Way<br>Rockville, MD 20854,<br><br>KILPATRICK TOWNSEND<br>  & STOCKTON, LLP,<br><br>607 14th Street, NW, Suite 900<br>Washington, DC 20005-2018,<br><br>       Defendants. | Civil Action No. <u>1:13-cv-1090</u><br><br><br>**JURY DEMANDED** |

## COMPLAINT

Plaintiff Lannan Foundation (the "Foundation"), by its attorneys Mayer Brown LLP, complains against Defendants Dennis M. Gingold and Kilpatrick Townsend & Stockton, LLP ("Kilpatrick Townsend"), as follows:

### NATURE OF THE CASE

1.     As stated below, the claims here are straightforward: the Foundation, a charitable organization, made a number of grants totaling millions of dollars to help fund a class-action lawsuit brought by Defendants, who were lawyers on behalf of the class. As a condition for the monetary grants, the class representatives as well as Defendants agreed that up to 50% of any attorneys' fees recovered in the litigation (including through a settlement of the lawsuit) would

1

be used to repay those grants.  Defendants together have received the lion's share of a $99 million attorneys' fees award as part of the settlement of that lawsuit, but have refused to pay back the approximately $4.54 million owed to the Foundation.

2.      In 1996, a putative class action, currently denominated as *Elouise Pepion Cobell, et al. v. Ken Salazar, Secretary of Interior, et al.*, No. 96-cv-1285 (the "Indian Trust Fund Litigation"), was filed in this District, asserting claims against the United States based upon wrongs committed against Native Americans whose land was held in trust by the Department of the Interior.  That case was litigated for more than 13 years before a settlement was reached.

3.      The Foundation was an early and steadfast supporter of the named plaintiffs and class members—and their counsel—that brought the Indian Trust Fund Litigation, and provided significant financial backing to that endeavor.  Between January 1998 and November 2009, the Foundation made eleven grants totaling $7.825 million to the Blackfeet Reservation Development Fund (the "BRDF"), a nonprofit organization created by Elouise Cobell, the lead plaintiff in the Indian Trust Fund Litigation.  The grants enabled the plaintiffs to retain accounting firm Price Waterhouse LLP and other experts, funded a public education campaign for the benefit of the plaintiff class, and provided funding for accounting expertise and support services for the plaintiff class during the settlement negotiations.

4.      Most of these funds—$6.425 million—were provided pursuant to seven refundable grant agreements, each of which provided:

     a.      "If, pursuant to judgment or settlement, Plaintiffs in the litigation or their attorneys receive from the United States (including any agency or department thereof) any attorney's fees and/or costs and/or expenses of the Litigation, the grantee shall take all appropriate action to ensure prompt payment to the Foundation of one-half of all such amounts recovered until the [grants are] repaid in full";

     b.      "By his signature, Dennis M. Gingold, [Plaintiffs'] lead counsel, acknowledges that one-half of any attorney's fees and/or costs and/or

        expenses of the Litigation recovered from the United States, by judgment or settlement, shall be paid to the Grantee, until the [grants are] repaid in full";

c.     "By separate assignments to [the BRDF], [the representative class plaintiffs], beneficiaries of this Agreement, have agreed to pay to [the BRDF] all amounts that any or all of them recover from the United States (including any agency or department thereof) related to attorney's fees and/or costs and/or expenses of the Litigation."

Copies of the grant agreements and the representative class plaintiffs' assignment to the BRDF are attached to this Complaint as Exhibits A and B.

5.     After nearly fourteen years of litigation, including multiple appeals, the parties to the Indian Trust Fund Litigation agreed to a $3.4 billion settlement.  The settlement was ultimately approved after a final fairness hearing, and a final judgment was entered.  The Court awarded to plaintiffs $99 million in attorneys' fees, costs, and expenses, to be divided among Defendants and one other attorney.  Upon information and belief, approximately $85.4 million of the attorneys' fees award has been paid out.

6.     Despite receiving millions of dollars from the attorneys' fee award issued in the Indian Trust Fund Litigation, Defendants have refused to repay the grants as set forth in the grant agreements.  Instead, Defendants have taken the position that, contrary to the clear terms of the agreements, the Foundation has no right to be repaid from the $99 million attorneys' fees award, and instead may pursue repayment only from the personal assets of the class representatives (or, in the case of Ms. Cobell, who passed away in October 2011, her estate).

7.     As set forth below, Defendants' failure to repay the grants has no basis in law or fact and has caused loss and injury to the Foundation.  Defendants have unjustly and unlawfully deprived the Foundation of millions of dollars in funds to which it has a legal right and that the Foundation could be using to assist other worthy causes.  Indeed, the Foundation's Board has established a $200,000 Tribal Colleges and Universities scholarship in the name of Elouise

Cobell at the American Indian College Fund, and has resolved to use up to $4 million of any grant repayments recovered from this lawsuit to endow this scholarship program permanently.

8.      The BRDF has executed an assignment transferring to the Foundation all claims it may have in connection with the refundable grant agreements.  The BRDF entered into this assignment specifically to enable the Foundation to bring claims to enforce the seven grant agreements against Defendants.

9.      Both on its own behalf and as assignee of the BRDF, the Foundation now seeks declaratory relief and damages from Defendants.

## PARTIES

10.     Plaintiff, the Lannan Foundation, is a family-owned nonprofit corporation dedicated to cultural freedom, diversity and creativity.  Established in 1960, the Foundation funds projects that support exceptional contemporary artists and writers, as well as inspired Native activists in rural indigenous communities.  In particular, the Foundation's Indigenous Communities Program is focused on providing financial assistance to Native-led nonprofit organizations and federally recognized tribes serving Native American communities, with an emphasis on projects in the areas of education, Native cultures, the revival and preservation of Native languages, environmental protection, and legal rights.  Between January 1, 2002, and December 31, 2011, the Foundation disbursed approximately $21.3 million through the Indigenous Communities Program.

11.     Defendant Gingold, an attorney, was lead counsel for the plaintiffs in the Indian Trust Fund Litigation from the inception of the case in 1996 until his withdrawal in December 2012.  Defendant is admitted to practice law in the District of Columbia, the State of New Jersey, and the State of Colorado.

12.     Defendant Kilpatrick Townsend is a law firm with 17 offices in California, Colorado, the District of Columbia, Georgia, New York, North Carolina, Washington, Sweden, Japan, Saudi Arabia, and China.  Keith M. Harper, a Kilpatrick Townsend partner, has been counsel for the plaintiffs in the Indian Trust Fund Litigation from the inception of the case in 1996 through the present.  Other attorneys at Kilpatrick Townsend have represented the plaintiffs since at least March of 1999.  Following Gingold's withdrawal, Kilpatrick Townsend is lead counsel for the plaintiffs.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) as the parties are diverse.  The Foundation is incorporated in Illinois, and its principal place of business is in New Mexico.  Upon information and belief, Defendant Gingold was and is a citizen of the State of Maryland.  Defendant Kilpatrick Townsend, while operating offices in several U.S. states, does not have an office in Illinois or New Mexico.  The amount in controversy exceeds $75,000.00, exclusive of costs and interest.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Many of the acts alleged in this Complaint and on which this action is founded occurred in substantial part within this District.  Defendants also are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

**A.      Elouise Cobell and the Individual Indian Money Account Program**

15.     The lead plaintiff in the Indian Trust Fund Litigation, Elouise Pepion Cobell, was a member of the Blackfoot Nation and a great-granddaughter of the legendary Blackfoot leader Mountain Chief.  Ms. Cobell devoted her life to advocating on behalf of Native Americans.  In 1987, she founded the Blackfeet National Bank, the first national bank owned by a Native

American tribe and located on a Native American reservation.  In 1997, Ms. Cobell was recognized for her work in increasing the financial literacy of Native Americans with a $310,000 "genius grant" from the MacArthur Foundation.  Ms. Cobell died of cancer on October 16, 2011, at the age of 65.

16.    In the 1980s, Ms. Cobell discovered through her work as Treasurer of the Blackfoot Nation numerous irregularities in the management of Individual Indian Money ("IIM") accounts, a program administered by the federal government to collect and disburse funds derived from the sale or lease of land or natural resources held in trust by the United States on behalf of individual Native American tribe members.  *Id.*

17.    The IIM accounts are the product of an unfortunate chapter in U.S. history:  the federal government's allotment program, which began with the enactment of the General Allotment Act of 1887, also known as the Dawes Act.  The General Allotment Act authorized the President to divide tribal-owned lands into parcels that were allocated to individual tribal members.  As the D.C. Circuit has explained, "Under the General Allotment Act, beneficial title of the allotted lands vested in the United States as trustee for individual Indians.  The trust was to last for 25 years or more, at which point a fee patent would issue to the individual Indian allottee.  During the trust period, individual accounts were to be set up for each Indian with a stake in the allotted lands, and the lands would be managed for the benefit of the individual allottees.  Indians could not sell, lease, or otherwise burden their allotted lands without government approval.  Where tribes resisted allotment, it could be imposed."  *Cobell v. Norton*, 240 F.3d 1081, 1087 (D.C. Cir. 2001).

18.    Where the amount of reservation land exceeded the amount needed for allotment, the General Allotment Act gave the federal government the right to purchase and sell the

"surplus lands."  The General Allotment Act thus "result[ed] in the widespread transfer of land from Indians to white settlers."  *Id.*  In 1934, Congress passed the Indian Reorganization Act of 1934, which ceased the allotment practice and authorized acquisition of tribal lands by the Secretary of the Interior that had been lost through the allotment process.  The 1934 Act, however, extended indefinitely the trust status of lands allotted under the General Allotment Act.  *See id.*

19.    In its capacity as trustee over the allotted lands, the federal government—specifically, the Department of the Interior and the Department of the Treasury—had fiduciary obligations to manage the lands held in trust for the benefit of the Native American beneficiaries and to hold and invest funds derived from exploitation of the lands or their resources in IIM accounts, and to distribute royalties to the account holders.  By the 1980s, the Department of the Interior was administering at least 300,000 IIM accounts from a single omnibus trust account. As the Secretary of the Interior later testified, however, the inadequate recordkeeping and reconciliation procedures implemented by the Department meant that the exact number of IIM accounts was unknown, as was the value and proper balance for each such account.

20.    Ms. Cobell petitioned the federal government for nearly twenty years to reform the IIM account system.  Between 1989 and 1991, Congress held oversight hearings on the Interior Department's administration of the IIM accounts; Ms. Cobell provided testimony as representative of the Ad Hoc Tribal Advisory Committee on BIA Trust Fund Management.

21.    In 1992, Congress issued a report that leveled strong criticism at the Interior Department, concluding that Interior's officials "have utterly failed to grasp the human impact of its financial mismanagement of the Indian trust fund."  Nonetheless, the Interior Department failed to remedy the situation.

22.     Finally, on June 10, 1996, Ms. Cobell, together with four other representative plaintiffs, filed a putative class action against the federal government on behalf of an estimated 300,000 IIM account holders, seeking a declaration that the Interior and Treasury Departments had breached their fiduciary obligations towards the class members and an injunction requiring an accurate accounting of the funds held in trust.  Defendant Gingold was one of the counsel for the named plaintiffs and the putative class.  Several attorneys at the Native American Rights Fund ("NARF"), including Keith Harper, were identified as "Of Counsel" on the complaint.

23.     On February 4, 1997, this Court (Hon. Royce C. Lamberth) certified a class comprising all present and future IIM account beneficiaries.  In granting class certification, Judge Lamberth found that the class representatives had "retained counsel"—namely, Gingold, attorney Thaddeus Holt, and the NARF attorneys (including Harper)—"to prosecute this lawsuit on behalf of the class."  Order Certifying Class Action at 2 (Dkt. # 27), entered Feb. 4, 1997.[1]

24.     On May 5, 1998, the District Court bifurcated the action for trial, with Phase I to address reforming the management and accounting of the IIM trust so as to meet the federal government's fiduciary duties, and Phase II to address historical accounting of the IIM accounts.

25.     On June 30, 2006, Harper, who by then no longer was an employee of NARF, sent a letter to Ms. Cobell confirming that he had been engaged directly to represent her and the other four representative plaintiffs in the Indian Trust Fund Litigation.  The engagement letter specifically declared that its provisions "inure[d] to the benefit of the parties, their heirs, successors, and assigns."

26.     Accordingly, and as attested to in a sworn affidavit to this Court, Harper has been counsel for the plaintiffs in the Indian Trust Fund Litigation "since inception of this litigation on

---

[1] All pleadings, motion papers, and other court submissions cited in this Complaint were filed in the Indian Trust Fund Litigation.

June 10, 1996 and at all times since." Affidavit of Keith Michael Harper ¶ 1 (Dkt. # 3762-1), filed on May 16, 2011.

27.     On July 5, 2006, Harper joined Kilpatrick Townsend as a partner. *See* Notice of Change of Address by Keith M. Harper (Dkt. # 3254), filed on July 10, 2006. On November 17, 2006, William E. Dorris, who was then the managing partner of Kilpatrick Townsend and currently serves as the firm's chairman, executed a fee agreement with Ms. Cobell regarding Kilpatrick Townsend's work on the Indian Trust Fund Litigation. Dorris confirmed that through an assignment, Kilpatrick Townsend had stepped into Harper's shoes with respect to the June 30, 2006 engagement letter, and that the representative plaintiffs' "contractual arrangement is now directly with [Kilpatrick Townsend] and not with … Keith Harper." Dorris also noted that Kilpatrick Townsend had "provided a draft of this letter to Dennis Gingold and he has indicated that I can confirm for you that the terms are reasonable."

28.     In addition to Harper, other attorneys at Kilpatrick Townsend have represented the plaintiffs continuously since March 1999. According to an affidavit filed in this Court by Dorris, over the past 14 years, more than 200 attorneys and employees at Kilpatrick Townsend performed services in connection with the Indian Trust Fund Litigation. *See* Affidavit of William E. Dorris ¶¶ 3, 5 (Dkt. # 3678-10), filed on January 25, 2011.

**B.      The Lannan Foundation's Support of the Indian Trust Fund Litigation**

29.     Ms. Cobell and the other plaintiffs faced substantial challenges in litigating over more than a century of financial mismanagement. Over the years, untold numbers of relevant documents had been destroyed in compliance with the document retention policies of the Interior and Treasury Departments or simply lost, including cancelled IIM trust checks and other records.

30.     In April 1997, Ms. Cobell reached out to the Foundation with a letter requesting funding in support of the Indian Trust Fund Litigation.   On August 7, 1997, several representatives of the Foundation, including Patrick Lannan, President of Lannan Foundation, travelled to East Glacier Park in Montana to meet with Ms. Cobell.

31.     Over breakfast, Ms. Cobell described the litigation, and related that the plaintiffs had retained the accounting firm Price Waterhouse LLP (now known as PricewaterhouseCoopers LLP) to conduct an audit of the IIM accounts and render other expert assistance during the discovery process.   Because the loss of documents made a full accounting impossible, Price Waterhouse had recommended the development and application of a method to estimate accurate account balances.   Price Waterhouse's proposal anticipated that this process would cost $3 million.   Although Ms. Cobell had received a $1 million grant from the Ford Foundation, the plaintiffs remained $2 million short.

32.     Following the meeting, the Foundation's representatives unanimously resolved to assist Ms. Cobell.   At its next meeting, in October 1997, the Indigenous Communities Program committee of the Foundation's board of directors approved a refundable grant of $2 million.   The grant agreement provided that the funds would be used to pay for the services of Price Waterhouse.   Because the Foundation's practice and policy was to make grants only to qualifying tax-exempt organizations, the grant was made to the BRDF, a non-profit organization that, as Defendants have informed this Court, was "formed specifically to fund [the Indian Trust Fund] [L]itigation."   Plaintiffs' Motion for Reconsideration of Class Representatives' Expense Application at 3 (Dkt. # 3839), filed on June 27, 2011.

33.     In the January 1998 grant agreement, the BRDF agreed as follows:

"If, pursuant to judgment or settlement, Plaintiffs in the Litigation or their attorneys recover from the United States (including any agency or department

10

thereof) any attorney's fees and/or costs and/or expenses of the Litigation, the Grantee shall take all appropriate actions to ensure prompt repayment to the Foundation of one-half of all such amounts recovered, until the grant is repaid in full.  In the event that one or more other non-profit entities contributed or have contributed funds towards the Litigation, the Grantee will share the one-half of the amounts recovered, pro rata, in proportion to amounts advanced by the other non-profit entities."

To facilitate repayment to the Foundation, the four named plaintiffs, including Ms. Cobell, assigned to the BRDF "all rights to any attorney's fees and/or costs and/or expenses of the [Indian Trust Fund] Litigation … recovered from the United States, whether pursuant to judgment or to settlement."  (The fifth original named plaintiff, Mildred Cleghorn, had died in a car accident in April 1997.)

34.     Defendant Gingold also executed the January 1998 grant agreement.  Signing in his capacity as "lead counsel," Gingold agreed that "[b]y his signature," he "acknowledge[d] that one-half of any attorney's fees and/or costs and/or expenses of the Litigation recovered from the United States, by judgment or settlement, shall be paid to the Grantee, until the grant is repaid in full."

35.     This provision was the result of extensive negotiations between the Foundation's counsel and Gingold, and was designed to ensure that reimbursement of the Foundation would be guaranteed as long as the plaintiffs or their attorneys received a sufficient award of attorneys' fees *or* expenses *or* costs.  As the Foundation's counsel advised Gingold at the time, the Foundation did not wish reimbursement to be dependent on a discretionary application for expenses.

36.     Over the next six years, the Foundation made six additional refundable grants to the BRDF:

- In February 2000, the Foundation awarded another $2.1 million in support of the work being conducted by Price Waterhouse, including the retention

of testifying and advising experts with expertise in the areas of natural resources, database manipulation and analysis, and historical mapping.

- In October 2002, the Foundation awarded an additional $1.5 million to support the plaintiffs' continued retention of their expert witnesses.

- In November 2003, April 2004, November 2004, and March 2005, the Foundation contributed a total of $825,000 to the funding of a massive public education campaign designed to educate both Native Americans and the general public about the Indian Trust Fund Litigation, and create pressure on the federal government to agree to a settlement.

On each occasion, the Foundation and the BRDF entered into a grant agreement that contained repayment provisions identical to those in the January 1998 agreement, including Gingold's signed commitment that up to one-half of any attorneys' fees, costs, or expenses awarded to the plaintiffs, whether through judgment or settlement, would be paid to the BRDF until the Foundation had been reimbursed. Through these seven refundable grants, the Foundation provided $6.425 million in furtherance of the Indian Trust Fund Litigation.

37.    In July 2005, the Foundation awarded another refundable grant of $500,000 to support the plaintiffs' public education campaign. The repayment provisions of this grant agreement were not identical to the seven earlier grants, and did not include a commitment from Gingold or another attorney for the plaintiffs.

38.    In addition to the eight refundable grants, the Foundation made three subsequent grants to the BRDF that were not refundable:

- In October 2007 and April 2008, the Foundation awarded a total of $800,000 to support the plaintiffs' continued retention of their expert witnesses. These were non-refundable grants as to which there was no repayment obligation.

- In November 2009, the Foundation awarded another $100,000 for the purpose of providing accounting expertise and support services as needed during discussions with the defendants in settlement negotiations in relation to the Indian Trust Fund Litigation. This, too, was a non-refundable grant.

In sum, between January 1998 and November 2009, the Foundation provided $7,825,000 in support of the Indian Trust Fund Litigation.  This continued and generous financial backing undoubtedly was critical to the efforts of plaintiffs and their counsel.

39.    Throughout this period, the Foundation formed deep ties with Ms. Cobell, for whom the litigation became a full-time endeavor and who proved to be a remarkable advocate for the hundreds of thousands of plaintiff class members.  In 2005, the Foundation honored Ms. Cobell with a Lannan Fellowship for Cultural Freedom in recognition of her struggle to defend the rights of Native peoples.

**C.     The 2006 Interim Fee Award**

40.    On May 27, 2004, at the close of the Phase I proceedings, Judge Lamberth directed the plaintiffs to submit an application for an interim fee award pursuant to the Equal Access to Justice Act ("EAJA").  *Cobell v. Norton*, 319 F. Supp. 2d 36, 41 (D.D.C. 2004).  Three months later, Plaintiffs filed a petition seeking $9,996,156.62 in attorneys' fees, including $4,817,641.70 in fees for Gingold and $1,064,466.71 in fees for Harper, as well as $4,532,310.59 in expenses.  *See* Plaintiffs' Equal Access to Justice Act Petition for Interim Fees Through the Phase 1.0 Proceeding at 81 (Dkt. # 2627), filed on August 27, 2004.

41.    On December 19, 2005, Judge Lamberth granted plaintiffs' petition.  The Court awarded plaintiffs $7,066,471.05, divided into $4,534,275.97 in attorneys' fees and $2,532,195.08 in expenses.  *Cobell v. Norton*, 407 F. Supp. 2d 140, 177 (D.D.C. 2005).

42.    The very next day, by email, Defendant Gingold informed one of the then-outside counsel for the Foundation, Howard McCue, that because the fees and expenses were "interim," they were, in Gingold's view, neither a "judgment" nor a "settlement" within the meaning of the refundable grant agreements, and the Foundation therefore was not entitled to any

reimbursement from what Gingold conceded was the largest EAJA interim fee award in history. Harper, at that time still employed by NARF, was carbon-copied on that email.

43.     McCue was disappointed and disturbed by Gingold's position, and promptly responded with a request for further discussion.  Gingold replied that he was very busy with appellate matters in the Litigation for the next several weeks, but acknowledged that there was "much to discuss in this regard."

44.     On January 19, 2006, Gingold emailed McCue to state that the interim award had been paid.  Gingold acknowledged that the Foundation's support had been "critical to meet the financial demands of plaintiffs' experts whose skills were necessary for plaintiffs to prevail" in the Phase I proceedings.  He also reversed his prior position, admitting that the "broad language" of the grant agreements entitled the Foundation to repayment of its pro rata share of up to one-half of the entire $7,066,471.05 interim award, including the sum allocated to attorneys' fees.[2]

45.     However, Gingold disputed the amount to which the Foundation was entitled, refusing to consider any amounts beyond the initial $2 million grant in calculating the repayment due the Foundation.  After more than a month of email exchanges and an in-person meeting between McCue and Gingold, the Foundation, Gingold, and the BRDF resolved the dispute.  The Foundation agreed to accept payment of $1,884,392.28—its pro rata share based on the initial $2 million grant only—and defer the remainder.

46.     Following this agreement, the BRDF repaid the Foundation $1,884,392.28, leaving a balance of $4,540,607.72 on the seven refundable grants.

---

[2] The refundable grant agreements provided that the Foundation would share "the one-half of the amounts recovered, pro rata, in proportion to amounts advanced by … other non-profit entities." At this time, two other nonprofits, the Otto Bremer Foundation and the Northwest Area Foundation, had provided funds to the BRDF with similar repayment provisions.

**D.     The Indian Trust Fund Litigation Settlement and the $99 Million Attorneys' Fees Award to Defendants**

47.     On December 8, 2009, the federal government announced that a $3.4 billion settlement had been reached in the Indian Trust Fund Litigation.  The Settlement Agreement provided for $1.4 billion to be allocated in the form of payments to class members, less attorneys' fees to be distributed to class counsel.  The Settlement Agreement further provided that the remaining $2 billion would be allocated for the purchase and consolidation of lands for the benefit of Native American tribes.  The Settlement Agreement also provided a mechanism through which class representatives could seek incentive awards.

48.     In connection with the settlement, the parties had executed a separate Agreement on Attorneys' Fees, Expenses, and Costs, providing for payment to the plaintiffs of up to $99 million to "compensate Class Counsel for reasonable attorney fees and related expenses and costs."  The $99 million was to be paid from an "Accounting/Trust Administration Fund" established by the Settlement Agreement, which in turn was to be funded by $1.412 billion "that Defendants shall pay into a Settlement Account held in the trust department of" a federally-insured depository institution.  The Settlement Agreement and the separate attorneys' fees agreement defined "Class Counsel" to mean "Dennis Gingold, Thaddeus Holt and attorneys from Kilpatrick Stockton LLP, including Elliott H. Levitas, Keith Harper, William Dorris, David Smith, William Austin, Adam Charnes and Justin Guilder."

49.     The settlement required legislative authorization.  Congress enacted the Claims Resolution Act of 2010, Pub. L. No. 111-291, which "authorized, ratified, and confirmed" the settlement; that Act was signed into law by President Obama on December 8, 2010.  The Act provided that in addition to the $1.412 billion set forth in the settlement agreement, "the

Secretary of the Treasury shall deposit in" the Accounting/Trust Administration Fund an additional $100 million.

50.     On December 10, 2010, the plaintiffs in the Indian Trust Fund Litigation filed an unopposed motion to modify the February 4, 1997 class certification order in accordance with the settlement agreement and implementing legislation by, among other things, appointing as class counsel Gingold, Holt, and certain attorneys from Kilpatrick Townsend, including Harper and Dorris.  On December 21, 2010, this Court (Hon. Thomas F. Hogan, to whom the case had been reassigned) granted that motion.

51.     On June 20, 2011, Judge Hogan conducted a fairness hearing on the proposed settlement.  During the hearing, Ms. Cobell spoke in her capacity as lead plaintiff to advocate for approval of the settlement.  Ms. Cobell also urged the District Court to approve the requested attorneys' fees amount as reasonable.

52.     At the close of the hearing, Judge Hogan approved the settlement.  With respect to attorney's fees, the District Court awarded the full $99 million "as reasonable and appropriate for the aggregate attorneys' fees, expense[s] and costs" through the date of the settlement agreement.

53.     The District Court also approved the payment of incentive awards to certain of the class representatives, including a remarkable $2 million award to Ms. Cobell.  Judge Hogan extolled Ms. Cobell's vision and perseverance, declaring that she "ha[d] accomplished more for the individual, I think, Native Americans than any other person recently that I can think of in history":

> "This is her case. She contributed hundreds of thousands of dollars. She helped fund raise. She spent hundreds and thousands of hours. She was part of every serious, strategic decision made. She dedicated up to 1,200 hours per year. She put her reputation on the line, her health, and has unprecedented efforts by a named plaintiff have not seen before in a class action case.  I believe she is fully entitled to the award that she has requested in this matter."

54.     However, the District Court denied the class representatives' application for $10.5 million in expenses, a sum that included the outstanding amounts on the seven refundable grants to the BRDF.   Shortly after the hearing, plaintiffs filed a motion for reconsideration of that decision with respect to the $4,540,607.72 owed to the Foundation.   *See* Plaintiffs' Motion for Reconsideration of Class Representatives' Expense Application at 3 (Dkt. # 3839), filed on June 27, 2011.

55.     The government defendants opposed the reconsideration motion, arguing that because the class representatives and the BRDF had agreed to reimburse the Foundation from "all amounts that any or all of them recover from the United States related to attorney's fees and/or costs and/or expenses of the [Indian Trust Fund] Litigation," the plain language of the refundable grant agreements required "***Ms. Cobell's attorneys***," not Ms. Cobell herself, to repay the $4,540,607.72 owed to the Foundation from the $99 million attorneys' fees award.   Defs.' Opp. to Pls.' Mot. for Reconsid. of Class Reps.' Expense App. at 4-5 (Dkt. # 3846), filed on July 14, 2011 (emphasis added).

56.     As of the date of this Complaint, the reconsideration motion remains pending.

57.     On July 27, 2011, the District Court issued an order granting final approval of the settlement, including the $1.512 billion Accounting/Trust Administration Fund.   With respect to attorneys' fees, the District Court immediately allocated approximately $85.4 million of the $99 million total among class counsel—that is, Gingold, Thaddeus Holt, and Kilpatrick Townsend— to be paid "out of the Settlement Account holding plaintiffs' funds immediately upon deposit of the funds in the Accounting/Trust Administration Fund."[3]

---

[3] The remaining sum of approximately $13.6 million was placed into escrow pending the resolution of claims for fees and expenses by certain non-class counsel.   A motion by plaintiffs to release these funds to Kilpatrick Townsend currently is pending.

58.     Upon information and belief, those funds subsequently were deposited in the Accounting/Trust Administration Fund by the Secretary of the Treasury, and the $85.4 million allotment was distributed among  Gingold, Holt, and Kilpatrick Townsend between November 7, 2012 and December 4, 2012.  On December 4, 2012, Gingold and Holt withdrew from the Indian Trust Fund Litigation, leaving Kilpatrick Townsend as sole counsel for the plaintiffs.

**E.     Defendants Refuse to Release Funds to the BRDF for Repayment to the Foundation.**

59.     Following the District Court's July 27, 2011 order, four class members brought appeals objecting to the settlement.  In the interim, the settlement payments and payment of the $99 million attorney's fees award did not take place.

60.     On or around November 7, 2012, Gingold announced via an open letter posted on http://www.indiantrust.com, a website administered by class counsel, that the appeals of the order granting settlement approval (including the attorneys' fee award) all had been denied or dismissed and that payments would be forthcoming.

61.     Beginning on November 8, 2012, McCue (counsel for the Foundation) sought to ascertain from Gingold when the Foundation should expect to receive payment on the balance of the seven refundable grants.  McCue and Gingold exchanged a number of emails on that subject the following month.

62.     The thrust of the correspondence was that Gingold refused to recognize any obligation on his part to facilitate reimbursement of the grants from the $99 million attorneys' fees award, and instead contended that the Foundation had no legal right to repayment from the $99 million attorneys' fees award.  McCue found this appalling, especially because Gingold had specifically agreed back in 2006 that he and the other plaintiffs' counsel would be responsible for ensuring repayment to the Foundation in the absence of an award of costs and expenses.

18

63.     Gingold's last email to McCue was sent on December 6, 2012.  Later that same day, the Foundation learned from public sources that Gingold and Holt had filed a motion to withdraw from representing the plaintiffs in the Indian Trust Fund Litigation.  Gingold had not notified McCue of his imminent plan to withdraw during any of their several exchanges over the past month.  A news article at the time noted that Gingold's "exit before all class members received their payments from the settlement was surprising to some long-time case observers," and quoted a class member as stating that "[Gingold] must have gotten his money."

64.     In his communications with McCue, Gingold appears to have taken the position that the Foundation will not be able to recover the outstanding grant monies unless (1) the pending motion to reconsider the District Court's denial of the class representatives' expense application is granted; or (2) the Foundation chooses to pursue recovery directly from the class representatives.

65.     Neither of these options is reasonable or acceptable.  The plain language of each of the seven grant agreements—which Gingold himself signed in his capacity as lead counsel—provides for repayment to the Foundation from "any attorney's fees and/or costs and/or expenses of the Litigation" recovered by "Plaintiffs in the Litigation *or their attorneys*."  This obligation was ratified by both Gingold and Kilpatrick Stockton in 2006, when Defendants manifested their recognition of that obligation by repaying the Foundation from the 2006 interim attorneys' fee award.

66.     Moreover, as the grant agreements make plain, the very reason why the Foundation required Gingold's signed commitment that any attorneys' fee award would be directed to repayment of the grants was to ensure that reimbursement would *not* be dependent on the success of an application for expenses.  And the Foundation should not be forced to choose

between forgoing more than $4.5 million to which it is entitled and that could be re-implemented to further important charitable goals on the one hand, and seeking to invade the incentive award monies of the individual class representatives (or, in the case of Ms. Cobell, her estate) on the other.

67.     Defendants apparently intend to justify their failure to repay the grants by contending that because the attorneys' fees were paid to class counsel from the Accounting/Trust Administration Fund, the attorneys' fees do not constitute monies "recovered from the United States."  Any such argument would be belied by the plain language of the Settlement Agreement; the Agreement on Attorneys' Fees, Expenses, and Costs; and the Claims Resolution Act.  Those instruments and that legislation provide that the Accounting/Trust Administration Fund was created as a result of the settlement between the plaintiffs and the federal government and that the funds held therein derive directly from the United States Treasury.

68.     Indeed, the Government itself has taken the position in briefing to this Court that the attorneys' fee award *was* "recovered from the United States," and that the plain language of the refundable grant agreements requires "Ms. Cobell's attorneys" to repay the $4,540,607.72 owed to the Foundation from the $99 million attorneys' fees award.  Defs.' Opp. to Pls.' Mot. for Reconsid. of Class Reps.' Expense App. at 4-5 (Dkt. # 3846), filed on July 14, 2011.  This is not surprising; the money for the attorneys' fee award came directly from the U.S. Treasury.

69.     The Foundation also has approached Kilpatrick Townsend (through counsel) to request that the Foundation be repaid from the attorneys' fee award.  Rather than honor its obligation to facilitate repayment to the Foundation, Kilpatrick Townsend has taken the position that it has no obligation whatsoever under the grant agreements and the Foundation has no right to any portion of Kilpatrick Townsend's share of the $99 million award.

70.    The BRDF has been advised of Gingold's and Kilpatrick Townsend's refusal to honor the terms of the grant agreements.  On April 18, 2013, the BRDF executed an assignment transferring to the Foundation "any and all rights, title, and interests the Fund has or may have in any monies paid as a part of or traceable to" the $99 million attorneys' fees award, as well as "any and all claims, demands, and causes of action of any kind whatsoever that the Fund has or may have against Gingold or any other counsel for the Plaintiff Class related to" the refundable grant agreements.  A copy of this assignment is attached to this Complaint as Exhibit C.

71.    Defendants' positions are belied by the plain language of the grant agreements, which provide that the Foundation is entitled to repayment from attorneys' fees recovered by plaintiffs *or* "their attorneys."  Gingold made a commitment in his capacity as lead counsel, with both actual and apparent authority to act on behalf of *all* class counsel, that the Foundation would be repaid from these sources.  Harper, and through him Kilpatrick Townsend, ratified and acquiesced to this authority by consenting to Gingold's agreement to repay the Foundation from the 2006 Interim Fee Award.

72.    The position Defendants apparently wish to take—that the Foundation would be required to seek recovery from the class representatives of their incentive awards rather than Defendants' repaying the Foundation a sum totaling less than 5% of the $99 million awarded to class counsel—is a shameful breach of not only Defendants' contractual obligations, but also the trust placed in them by the Foundation and the fiduciary duties Defendants owe their clients, including the late Ms. Cobell.  The Foundation made this litigation and the resulting settlement possible.  Defendants themselves admit that the Foundation "generously and loyally backstopped Ms. Cobell in this case when no one else would," and provided continued funding "for what

appeared to be an infinite or indeterminate duration."  Plaintiffs' Motion for Reconsideration of

Class Representatives' Expense Application at 6 (Dkt. # 3839), filed on June 27, 2011.

73.     Because informal efforts to resolve this situation have failed, the Foundation is

compelled to bring suit to remedy this wrong.

## COUNT I
### Declaratory Relief

74.     The Foundation repeats and realleges paragraphs 1-73 above as if fully set forth

herein.

75.     In exchange for the Foundation's provision of millions of dollars to be used to

benefit the plaintiffs in the Indian Trust Fund Litigation, the BRDF agreed that if "Plaintiffs in

the Litigation or their attorneys recover from the United States (including any agency or

department thereof) any attorney's fees and/or costs and/or expenses of the Litigation," the

BRDF would "ensure prompt repayment to the Foundation … until the grant is repaid in full."

Gingold in his capacity as plaintiffs' lead counsel, "acknowledge[d] that … any attorney's fees

and/or costs and/or expenses of the Litigation recovered from the United States, by judgment or

settlement, shall be paid to the [BRDF], until the grant is repaid in full."

76.     As lead counsel, Gingold had authority to sign and did sign the grant agreements

on behalf of all counsel for the plaintiffs, including Harper.  Kilpatrick Townsend succeeded to

this obligation through the assignment by Harper of his contractual retention agreement with Ms.

Cobell and the other class representatives.  Further, six of the seven grant agreements were

entered into after March 1999, when Kilpatrick Townsend itself became counsel to the plaintiffs.

Both Gingold and Kilpatrick Townsend reaffirmed their agreement to and ratified the terms of

the seven grant agreements by acknowledging the Foundation's entitlement to and paying the

Foundation a percentage of the attorneys' fees and legal expenses awarded to the plaintiffs in the 2006 Interim Fee Award.

77.     There is no question that the $99 million in fees that Judge Hogan awarded to plaintiffs constitutes "attorney's fees and/or costs and/or expenses of the Litigation recovered from the United States[] by judgment or settlement."  The attorney's fee award was paid from a fund established pursuant to settlement with the federal government and funded by the Treasury Department pursuant to an Act of Congress.  In briefs to this Court, the federal government itself has agreed that the $99 million attorneys' fees award constitutes funds "recovered from the United States."

78.     An actual controversy exists, and the Foundation is entitled to a declaratory judgment that Defendants are required by the terms of the seven grant agreements to pay or ensure collective payment by class counsel of $4,540,607.72 to the BRDF for purposes of repaying the Foundation.

## COUNT II
### Breach Of Contract

79.     Plaintiff repeats and realleges paragraphs 1-78 above as if fully set forth herein.

80.     Each of the seven grant agreements is a valid and binding contract entered into among the Foundation, the BRDF, and any other signatory to the agreement.  Through plaintiffs' lead counsel, Gingold, Defendants agreed to the terms of the grant agreements by signing those instruments.  Defendants also bear a duty of good faith and fair dealing under the grant contracts.

81.     The Foundation performed its obligations under the grant agreements through its provision of more than $6 million in refundable grants for the benefit of the plaintiffs in the Indian Trust Fund Litigation.

82.     Gingold's written commitment as plaintiffs' lead counsel that the Foundation would be repaid if "Plaintiffs … or their attorneys" recovered "any attorney's fees and/or costs and/or expenses" from the federal government through the Indian Trust Fund Litigation, is valid and enforceable by the Foundation against Defendants, jointly and severally.

83.     Further, Defendants' promise to ensure that one-half of any award of attorneys' fees, costs, or expenses would be paid to the BRDF explicitly was intended to facilitate the BRDF's repayment of the seven grants, and thus was intended to benefit the Foundation directly. As an intended beneficiary of that promise, the Foundation has a direct interest and an enforceable right in Defendants' performance of that promise.

84.     Defendants' refusal to pay to the BRDF or the Foundation any funds from the $99 million attorneys' fees award has prevented the contractually-required reimbursement, and constitutes a material breach of their written promise, as well as a breach of Defendants' duty of good faith and fair dealing under the terms of the grant agreements.

85.     As a result of this breach, the Foundation has sustained damages in an amount to be determined at trial, but in no event less than $4,540,607.72 plus interest.

## COUNT III

### Breach of Contract
### (as assignee of the BRDF)

86.     Plaintiff repeats and realleges paragraphs 1-78 and 80-81 above as if fully set forth herein.

87.     Gingold's written commitment as plaintiffs' lead counsel that the BRDF would be paid up to one-half of "any attorney's fees and/or costs and/or expenses" recovered from the federal government through the Indian Trust Fund Litigation, until the Foundation had been

repaid in full on the seven refundable grants, is valid and enforceable by the BRDF against Defendants, jointly and severally.

88.     As the assignee and beneficiary of all of the BRDF's claims, demands, and causes of action that it may have with respect to the seven grant agreements, the Foundation is entitled to enforce Defendants' obligations to the BRDF under those agreements.

89.     Defendants' refusal to honor Gingold's written commitment and permit the grants to be repaid from the $99 million attorneys' fees award has prevented BRDF from honoring its own contractual obligation to reimburse the Foundation, and constitutes a material breach of Defendants' promise to the BRDF and a breach of their duty of good faith and fair dealing under the terms of those agreements.

90.     As a result of Defendants' breach of their promise to the BRDF, the BRDF has sustained damages in an amount to be determined at trial, but in no event less than $4,540,607.72 plus interest.

## COUNT IV

### Intentional Interference With Contractual Relations
### (as assignee of the BRDF)

91.     The Foundation repeats and realleges paragraphs 1-78 and 80-81 above as if fully set forth herein.

92.     The seven refundable grant agreements, which the Foundation and the BRDF entered into in good faith, create a valid and enforceable obligation on the part of the BRDF to repay the Foundation from "any attorney's fees and/or costs and/or expenses" recovered by "Plaintiffs … or their attorneys" from the federal government through judgment pursuant to or settlement of the Indian Trust Fund Litigation.

93.     As each of the grant agreements explicitly recognizes, the BRDF's ability to fulfill this obligation from an attorneys' fee award to class counsel is dependent on the cooperation of class counsel.   Accordingly, each of the agreements contains a written acknowledgement by Defendant Gingold—the lead class counsel in the Indian Trust Fund Litigation—that up to one-half of any attorneys' fees award was to be directed to the BRDF for purposes of repaying the Foundation.

94.     Despite this written acknowledgement, both Gingold and Kilpatrick Townsend intentionally diverted to themselves funds from the $99 million attorneys' fees award that they knew already had been assigned to and belonged to the BRDF.   Further, having wrongfully seized these funds, both Gingold and Kilpatrick Townsend  have refused either to reimburse the Foundation directly or to tender to the BRDF funds sufficient to reimburse the Foundation.

95.     Through this wrongful conduct, Defendants have precluded the BRDF from honoring its contractual obligations to reimburse the Foundation.  Defendants are well aware that the BRDF, a nonprofit, does not otherwise have on hand sufficient funds to repay the more than $4.5 million owed on the seven refundable grant agreements.

96.     Thus, by their actions, Defendants thus intentionally have interfered with the BRDF's ability to fulfill its contractual obligations to the Foundation under the seven grant agreements, and induced the BRDF to breach those agreements.  As the assignee and beneficiary of all of the BRDF's claims, demands, and causes of action that it may have with respect to the seven grant agreements, the Foundation is entitled to seek redress of this wrong.

97.     As a result of Defendants' conduct, the Foundation has sustained damages in an amount to  be determined at trial, but in no event less than $4,540,607.72 plus interest.

98.     Because Defendants have acted wantonly, willfully, and with reckless disregard of the resultant harm to the BRDF, the BRDF is entitled to recover punitive damages, as well as payment of the attorneys' fees, costs, and expenses incurred in bringing this lawsuit.

**COUNT V**

**Breach of Fiduciary Duty**
**(as assignee of the BRDF)**

99.     Plaintiff repeats and realleges paragraphs 1-78 and 80-81 above as if fully set forth herein.

100.    As their counsel, Defendants owed and continue to owe fiduciary obligations to Ms. Cobell (and her estate) and the other class representatives arising out of the attorney-client relationship, including a duty of loyalty and a duty to safeguard their clients' assets.

101.    In their assignment to the BRDF, Ms. Cobell and the other class representatives assigned "all rights to any attorney's fees and/or costs and/or expenses of the" Indian Trust Fund Litigation "recovered from the United States, whether pursuant to judgment or settlement, that the [class representatives] recover[ed] as a result of the litigation."  The scope of the class representatives' assignment to the BRDF thus includes "all rights" to any attorneys' fees, whether those rights arise under contract or are imposed by law, including all rights arising out of the class representatives' fiduciary relationship with Defendants with respect to any award of attorneys' fees in the Indian Trust Fund Litigation.

102.    Moreover, Defendants recognized that the BRDF was a means through which Ms. Cobell obtained financing for the litigation that Defendants were pursuing.  Defendants treated the BRDF as the equivalent of Ms. Cobell (who had founded the BRDF), making no substantive distinction between them.  Indeed, in a filing to this Court, Defendants have stated that because "Ms. Cobell and [the] BRDF pursued the identical goal through different means," "the primary

distinction between them is one of form rather than substance."  Reconsideration Motion at 2 n.2 & 32.  The Defendants also promised to ensure that attorneys' fees recovered from the United States would be paid to the BRDF.  Through this conduct, the Defendants formed a special relationship of trust and confidence with the BRDF, giving rise to a fiduciary relationship between themselves and the BRDF.

103.    As the beneficiary of the BRDF's valid assignment of all claims, demands, and causes of action that it may have with respect to the seven grant agreements, the Foundation is entitled to enforce these same fiduciary duties against Defendants on behalf of the BRDF.

104.    Defendants, through Gingold, had contemporaneous knowledge of the class representatives' assignment to the BRDF of their rights to attorneys' fees, which was executed concurrently with the first of the refundable grant agreements.  Thus, long before any portion of the $99 million attorneys' fees award had been paid, Defendants knew—or should have known—that $4,540,607.72 of that sum was not theirs to receive.  It had been assigned by the plaintiffs to the BRDF.

105.    Defendants owed fiduciary duties to Ms. Cobell, the other class representatives, and the BRDF; knew of the assignment to the BRDF; and had agreed that "one-half of any attorney's fees and/or costs and/or expenses of the Litigation recovered from the United States, by judgment or settlement, shall be paid to" the BRDF for purposes of repaying the Foundation on the seven grant agreements.  And they reaffirmed and ratified that promise by repaying Lannan from the 2006 Interim Fee Award.  Nevertheless, Defendants knowingly sought and accepted funds that already had been assigned to the BRDF, rather than honoring their obligation to ensure that those funds were paid to the BRDF.  They since have refused to pay over to the BRDF any portion of the tens of millions of dollars they have received from the attorneys' fees

awarded to plaintiffs.  In short, Defendants have circumvented the assignment and their clients' intentions with respect to that instrument.

106.    In other words, out of a desire to maximize their own enrichment, Defendants have engaged in conduct that diverted assigned attorneys' fees recovered by plaintiffs away from their rightful owner, the BRDF, against the wishes of the plaintiffs.  This shameful conduct constitutes an ongoing breach of Defendants' fiduciary duties (including their duty of loyalty and their duty to safeguard assets) to Ms. Cobell's estate and to the other class representatives, as well as an ongoing breach of Defendants' fiduciary duties to the BRDF itself.  As assignee of "any and all claims, demands, and causes of action of any kind whatsoever" that the BRDF has against Defendants in connection with the refundable grant agreements, the Foundation is entitled to bring suit to redress these breaches.

107.    Defendants cannot seriously contend that they have no duty to honor the assignment on the purported basis that the attorneys' fee award does not come within the scope of the grant agreements.  Any argument that the $99 million attorneys' fees award—money deposited by the United States Treasury into a fund that was established by a settlement with the U.S. government and ratified by an Act of Congress—somehow does not constitute funds "recovered from the United States" would be patently absurd.

108.    As a result of Defendants' breach of their fiduciary duties, the BRDF has sustained damages in an amount to be determined at trial, but in no event less than $4,540,607.72 plus interest.

109.    Because Defendants have acted wantonly, willfully, and with reckless disregard for the rights and wishes of their clients, the BRDF is entitled to recover punitive damages, as well as payment of the attorneys' fees, costs, and expenses incurred in bringing this lawsuit.

## COUNT VI

### Aiding and Abetting Breach of Fiduciary Duty
### (as assignee of the BRDF)

110.    Plaintiff repeats and realleges paragraphs 1-78 and 99-109 above as if fully set forth herein.

111.    Defendants breached and continue to this day to breach their fiduciary obligations to Ms. Cobell (and her estate), to the other class representatives, and to the BRDF itself.

112.    Kilpatrick Townsend knew that Gingold owed fiduciary obligations to Ms. Cobell (and her estate), the other class representatives, and the BRDF.  Kilpatrick Townsend also knew that the class representatives had assigned their rights to any attorneys' fees to the BRDF with the intention that such fees be used in the first instance to repay the Foundation for its invaluable support of the Indian Trust Fund Litigation, and that Gingold was breaching his fiduciary obligations to Ms. Cobell, the other class representatives, and the BRDF by seeking and accepting payment of fees that already had been assigned to the BRDF and that Defendants had promised to ensure would be paid to the BRDF.

113.    Similarly, Gingold knew that Kilpatrick Townsend owed fiduciary obligations to Ms. Cobell (and her estate), to the other class representatives, and to the BRDF.  Gingold also knew that the class representatives had assigned their rights to any attorneys' fees to the BRDF with the intention that such fees be used in the first instance to repay the Foundation for its invaluable support of the Indian Trust Fund Litigation, and that Kilpatrick Townsend was breaching its fiduciary obligations to Ms. Cobell, the other class representatives, and the BRDF by seeking and accepting payment of fees that already had been assigned to the BRDF and that Defendants had promised to ensure would be paid to the BRDF.

114.    Gingold and Kilpatrick Townsend each knowingly aided and abetted the other's breach of those fiduciary obligations.  Defendants rendered substantial assistance to one another through the following overt acts:  co-signing submissions to the Court requesting the diversion of these assigned attorneys' fees away from their rightful owner, the BRDF; filing materials, including sworn affidavits, in support of such submissions; and deliberately failing to inform the Court that the attorneys' fees being sought in those submissions already had been assigned to the BRDF.

115.    As a result of Defendants' aiding and abetting conduct, the BRDF has sustained damages in an amount to be determined at trial, but in no even less than $4,540,607.72 plus interest.

116.    Because Defendants have acted wantonly, willfully, and with reckless disregard for the rights of the BRDF and the wishes of their clients, the BRDF is entitled to recover punitive damages, as well as payment of the attorneys' fees, costs, and expenses incurred in bringing this lawsuit.

## COUNT VII

### Unjust Enrichment
### (in the Alternative to Counts II & III)

117.    Plaintiff repeats and realleges paragraphs 1-78 above as if fully set forth herein.

118.    Over a period of seven years, the Foundation provided significant financial assistance to the furtherance of the Indian Trust Fund Litigation.  As Defendants have admitted to this Court, the Foundation "generously and loyally backstopped Ms. Cobell in this case when no one else would," and provided continued funding "for what appeared to be an infinite or indeterminate duration."   Plaintiffs' Motion for Reconsideration of Class Representatives' Expense Application at 6 (Dkt. # 3839), filed on June 27, 2011.  The $6.425 million in

refundable grant monies contributed by the Foundation was used to pay for a top accounting firm and other experts, and to fund a nationwide outreach campaign.  The Foundation thus contributed substantially to the plaintiffs' achievement of their historic $3.4 billion settlement agreement with the federal government and to the judicial approval of that settlement.

119.    Defendants have been enriched by millions—if not tens of millions—of dollars through their participation in the $99 million attorneys' fees award that accompanied the settlement.

120.    It would be against equity and good conscience to permit Defendants to accept the substantial financial benefits of the Foundation's support of the Indian Trust Fund Litigation, but disclaim their promises and obligation to facilitate repayment to the Foundation from funds acquired directly through the success of that litigation.

121.    To prevent this unjust enrichment, Defendants must be disgorged of the $4,540,607.72 still outstanding on the refundable grants, an amount that constitutes less than 5% of the $99 million attorneys' fees award.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lannan Foundation respectfully requests that judgment be entered as follows:

Entry of a declaratory judgment that Defendants are obligated jointly and severally by the terms of the seven grant agreements to pay or ensure payment of $4,540,607.72 to the BRDF for purposes of repaying the Foundation; and

An award in favor of Plaintiff and against Defendants, jointly and severally, for:

A.    Compensatory damages in an amount no less than $4,540,607.72;

B.    Punitive damages;

C.    Attorneys' fees and costs;

D.    Prejudgment interest at the maximum legal rate; and

E.    Such other and further relief as the Court may deem just and proper.


## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.


Dated: July 16, 2013

By:    /s/ Reginald R. Goeke
REGINALD R. GOEKE, SBN # 453613
rgoeke@mayerbrown.com
ARCHIS A. PARASHARAMI, SBN # 477493
aparasharami@mayerbrown.com
CATHERINE A. BERNARD, SBN # 485127
cbernard@mayerbrown.com

MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC  20006-1101
Telephone:    (202) 263-3000
Facsimile:    (202) 263-3300

*Attorneys for Plaintiff Lannan Foundation*

704966512