**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LANNAN FOUNDATION,

       Plaintiff,

   v.

DENNIS M. GINGOLD,

       Defendant.

Civil Action No. 13-01090 (TFH)

## <u>MEMORANDUM OPINION</u>

## MOTION TO DISMISS [ECF No. 20]

## AND

## MOTION FOR LEAVE TO FILE
## SUPPLEMENTAL COMPLAINT [ECF No. 29]

# MEMORANDUM OPINION

INTRODUCTION ------------------------------------------------------------- 1

ALLEGATIONS AND PROCEDURAL POSTURE -------------------------------------- 2

STANDARDS OF REVIEW ------------------------------------------------------ 7

    **I.**     Legal Standard to Supplement a Pleading Pursuant to Rule 15(d) ----------7

    **II.**    Standard of Review for Motion to Dismiss Under Rule 12(b)(1) -------------9

    **III.**   Standard of Review for Motion to Dismiss Under Rule 12(b)(6) ------------9

**ANALYSIS** --------------------------------------------------------------10

    **I.**     Standing and The Court's Jurisdiction Over The Claims --------------------12

      **A.** Prudential Standing ------------------------------------------------- 12

      **B.** Article III Standing ------------------------------------------------- 14

        **1.**    Injury in Fact --------------------------------------------------15

          a.   The Plain Language of the Assignment ---------------------------20

        **2.**    Causation -----------------------------------------------------------21

        **3.**    Redressability -------------------------------------------------------22

    **II.**    Timeliness of The Foundation's Claims -----------------------------------23

    **III.**   Rule 12(b)(6) Challenges ------------------------------------------------27

      **A.** Failure to State a Claim: Counts II and III - Breach of Contract ------------27

        **1.**   Contract Interpretation and Formation --------------------------------- 27

        **2.**   Conditions Precedent-------------------------------------------------34

      **B.** Failure to State a Claim: Count IV - Tortious Interference With

        Contractual Relations ------------------------------------------------37

      **C.** Failure to State a Claim: Count VI – Aiding and Abetting Breach

        of Fiduciary Duty ------------------------------------------------- 38

      **D.** Failure to State a Claim: Count VII – Unjust Enrichment --------------------39

    **IV.**   Declaratory Judgment ----------------------------------------------- 40

    **V.**     The Foundation's Motion to Supplement and the Assignability of

      Breach of Fiduciary Duty Claims in the District of Columbia ---------------41

    **CONCLUSION** ------------------------------------------------------------46

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LANNAN FOUNDATION,

      Plaintiff,

v.

DENNIS M. GINGOLD,

      Defendant.

Civil Action No. 13-01090 (TFH)

## MEMORANDUM OPINION

### INTRODUCTION

Pending before the Court are two motions. One is defendant, Dennis M. Gingold's, Motion to Dismiss [ECF No. 20], and the second is plaintiff, Lannan Foundation's ("the Foundation"), Motion for Leave to File Supplemental Complaint [ECF No. 29]. Gingold's Motion to Dismiss seeks dismissal of the Foundation's Complaint with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) for, *inter alia*, failure to state a claim and lack of standing. The Foundation's Motion for Leave to File Supplemental Complaint seeks leave to file a supplemental complaint under Fed. R. Civ. P. 15(d) to "account for events that have occurred since it filed its Complaint." Mot. for Leave 1 [ECF No. 29]. Upon full consideration of the parties' submissions, oral argument held on September 10, 2014, the record in this case, and the applicable law, the Court will deny in part and grant in part Gingold's Motion to Dismiss and grant the Foundation's Motion for Leave to File Supplemental Complaint.

## ALLEGATIONS AND PROCEDURAL POSTURE

In 1996, the beneficiaries of Individual Indian Money ("IIM") trust accounts filed a class-action lawsuit against the Secretaries of the Interior and Treasury Departments and other federal government officials to obtain a judicial declaration confirming the scope of the government's trust obligations and an injunction compelling the performance of those obligations.[1] *See Cobell v. Norton*, 240 F.3d 1081, 1092-93 (D.C. Cir. 2001). On February 4, 1997, the Honorable Royce C. Lamberth certified a class comprising all present and future IIM account beneficiaries. Order Certifying Class Action 2, *Cobell, et al v. Salazar, et al.*, 1:96-cv-01285 (D.D.C. Feb. 4, 1997) [ECF No. 27]. Judge Lamberth also noted that the class had "retained counsel to prosecute this lawsuit on behalf of the class." *Id.* Defendant Gingold was one such counsel.

Recognizing the monumental task before her in litigating a century of alleged financial mismanagement, Class Representative Elouise Cobell reached out to the Lannan Foundation[2] in the fall of 1997 with a letter requesting financial support. Compl. ¶¶ 29-30 [ECF No. 1]. After the Foundation resolved to assist the Class, Ms. Cobell created the Blackfeet Reservation Development Fund[3] ("BRDF"), a nonprofit organization domiciled on the Blackfeet Reservation in Browning, Montana, to seek and receive grants from non-profit organizations. *Id.* ¶¶ 3, 29-32.

---

[1] The statements and allegations contained in this section were extracted from sources which the Court may take judicial notice, allegations contained in the Complaint [ECF No. 1], or documents attached to the Complaint as exhibits or incorporated by reference.

[2] The Lannan Foundation is a family-owned nonprofit corporation that, among other undertakings, provides financial assistance to Native-led nonprofit organizations with an emphasis on projects involving legal rights. *Id.* ¶ 10.

[3] Her counsel, and now defendant in this suit, Gingold previously represented to the Court that the BRDF was formed "specifically to fund [the *Cobell*] litigation." Plaintiffs' Mot. for Reconsideration of Class Representatives' Expense Application 3, *Cobell,* 1:96-cv-01285 (D.D.C. June 27, 2011) [ECF No. 3839]; Compl. ¶ 32.

A few months after Ms. Cobell's initial request, the Foundation made its first refundable

grant to the BRDF in the amount of $2 million to pay for the services of Price Waterhouse LLP

(now Pricewaterhouse Coopers LLP or PwC). Compl. ¶ 32. The Grant Agreement states in

relevant part:

> This Agreement ("Agreement") is made between the Lannan Foundation (hereinafter the "Foundation") and Blackfeet Reservation Development Fund, Inc. (hereinafter the "Grantee").
> …
> **C. Grant Conditions**
> …
> **4. Reversion of grant funds:**
> …
> If, pursuant to judgment or settlement, Plaintiffs in the litigation or their attorneys recover from the United States (including any agency or department thereof) any attorney's fees and/or costs and/or expenses of the Litigation, the grantee shall take all appropriate action to ensure prompt payment to the Foundation of one-half of all such amounts recovered until the grant is repaid in full. In the event that one or more other non-profit entities contributed or have contributed funds toward the Litigation, the Grantee will share the one-half of the amounts recovered, pro rata, in proportion to amounts advanced by the other non-profit entities.
>
> By his signature, Dennis M. Gingold, [Plaintiffs'] lead counsel, acknowledges that one-half of any attorney's fees and/or costs and/or expenses of the Litigation recovered from the United States, by judgment or settlement, shall be paid to the Grantee, until the grant is repaid in full.
>
> By separate assignments to the Blackfeet Reservation Development Fund, Elouise Pepion Cobell, Earl Old Person, Thomas Maulson, and James Louis Larose, beneficiaries of this Agreement, have agreed to pay to the Blackfeet Reservation Development Fund all amounts that any or all of them recover from the United States (including any agency or department thereof) related to attorney's fees and/or costs and/or expenses of the Litigation.

*Id.* Ex. A. 4 [ECF No. 1-2]. Ms. Cobell and Gingold both signed the agreement under the

heading "Grantee." *Id.* at 5. Ms. Cobell signed on behalf of the BRDF, and defendant Gingold

signed as "Plaintiff's Counsel."

Within a month of the first Grant Agreement, named plaintiffs Elouise Pepion Cobell,

Earl Old Person, James Louis Larose, and Thomas Maulson executed their contemplated

assignment to the BRDF. Ex. B to Compl. 2-4 [ECF No. 1-3]. The simple assignment states in whole:

> This assignment is made between the Blackfeet Reservation Development Fund ("Fund") and Elouise Pepion Cobell, Earl Old Person, Thomas Maulson, and James Louis Larose.

> In consideration of payment by the Fund of certain fees and expenses incurred in relation to Civil Action 96-01285 in the United States District Court for the District of Columbia ("the Litigation"), an action in which each of the undersigned is a plaintiff, each of the undersigned assigns to the Fund all rights to any attorney's fees and/or costs and/or expenses of the Litigation, recovered from the United States, whether pursuant to judgment or to settlement, that the undersigned recovers as a result of the Litigation.

*Id.* at 2.

Over the next seven years, the Foundation made six additional refundable grants to the BRDF: (1) February 2000 Grant Agreement in the amount of $2,100,000 to fund services performed by Price Waterhouse LLP in support of the Litigation; (2) November 2002 Grant Agreement in the amount of $1,500,000 to fund services performed by expert witnesses named in a referenced grant proposal; (3) November 2003 Grant Agreement in the amount of $50,000 to fund services performed by Northwest Strategies in support of a public education campaign; (4) April 2004 Grant Agreement in the amount of $275,000 to fund services performed by THE PR CONSULTING GROUP in support of a public education campaign; (5) November 2004 Grant Agreement in the amount of $200,000 to fund services performed by THE PR CONSULTING GROUP in support of a public education campaign; and (6) March 2005 Grant Agreement in the amount of $300,000 to fund services in support of a public education campaign. *See generally* Ex. A. to Compl. In total, the BRDF received $6,425,000 in refundable

grants from the Foundation.[4] Compl. ¶¶ 3, 4, 32-36. Each of these six grant agreements contained the same reversionary language as the 1998 Grant Agreement. Ex. A. to Compl. Ms. Cobell signed on behalf of the BRDF and defendant Gingold signed as "Plaintiff's Counsel" under the column heading "Grantee" for all Grant Agreements.

As the litigation continued through 2006, Judge Lamberth granted the Class Representatives' petition for an interim fee award pursuant to the Equal Access to Justice Act, awarding the plaintiffs $7,066,471.05 for attorneys' fees and expenses. Compl. ¶¶ 40-42. Upon receipt of the interim fee award, Gingold disputed whether any of the funds were subject to the provisions of the BRDF's refundable grants, arguing that the award was based on "interim" fees and expenses. *Id.* ¶¶ 42-44. Ultimately, Gingold and the Foundation resolved the dispute without judicial intervention and the Foundation received $1,884,392.28 as a "pro rata" share of the fee and expense award based only on its initial $2 million grant.[5] *Id.* ¶ 45. The Foundation agreed to defer the remaining outstanding balance of $4,540,607.72. *Id.* ¶¶ 45-46.

After approximately 13 years of litigation, the parties in *Cobell* entered into a settlement agreement to resolve the case. *See* Joint Mot. for Preliminary Approval of Settlement 1, *Cobell*, 1: 96-cv-1285 (D.D.C. Dec. 10, 2010) [ECF No. 3660]. The *Cobell* parties also executed a separate Agreement on Attorneys' Fees, Expenses, and Costs that provided for the payment of up to $99,000,000 for reasonable attorneys' fees and costs. Compl. ¶ 48. Those fees, expenses, and costs were paid from an "Accounting/Trust Administration Fund" established by the Settlement Agreement and funded by $1.412 billion "that Defendants [paid] into a Settlement Account held

---

[4] The Foundation also made non-refundable grants to help fund the *Cobell* suit. Including those grants, the Foundation provided $7,825,000 in financial support. Compl. ¶ 38.

[5] The Foundation split some of the award with two other non-profit entities that had also contributed funds to the BRDF. Compl. at 14 n.2.

in the trust department of" a federally-insured depository institution. *Id.* ¶ 48. On December 8, 2010, President Barack Obama signed the Claims Resolution Act of 2010, Pub. L. No. 111-291, approving and authorizing the *Cobell* settlement. *Id.* ¶ 49.

On June 20, 2011, the Court conducted a Fairness Hearing and announced that it was approving the *Cobell* Settlement Agreement. Compl. ¶¶ 51-52. The Court also granted in part the Class Representatives' motion for incentive awards but denied a request for over $10,000,000 in expenses – which included the outstanding balance on the seven refundable grants. *Id.* ¶¶ 53-54. On July 27, 2011, the Court issued an order granting final approval of the settlement and allocated $85.4 million of the $99 million in attorneys' fees to Gingold and his co-counsel.[6] *Id.* ¶ 57. Gingold and his co-counsel received their fees between November 7, 2012 and December 4, 2012. *Id.* ¶ 58.

The day after the Court allocated attorneys' fees, Howard McCue, counsel for the Foundation, contacted Mr. Gingold to determine when and how the Foundation would receive payment on the balance of the refundable grants. *Id.* ¶ 61. After exchanging a number of emails over the next month, Gingold "refused to recognize any obligation on his part to facilitate reimbursement of the grant from the $99 million attorneys' fees award, and instead contended that the Foundation had no legal right to repayment from the $99 million attorneys' fees award." *Id.* ¶¶ 61-62.

In the spring of 2013, the BRDF executed an Assignment Agreement with the Foundation, assigning its rights to pursue the outstanding balance on the refundable grants through the claims asserted here. *Id.* Ex. C, Assignment Agreement 2 [ECF No. 1-4]. On July 16,

---

[6] The remaining sum of approximately $13.6 million was placed into escrow pending the resolution of claims for fees and expenses by certain non-class counsel.

2013, the Foundation filed suit against Dennis M. Gingold and Kilpatrick Townsend & Stockton, LLP. *See generally* Compl. [ECF No. 1]. In its Complaint, the Foundation pled one count of declaratory relief and six counts of monetary relief through claims for (II) breach of contract; (III) breach of contract (as assignee of the BRDF's interests); (IV) intentional interference with contractual relations; (V) breach of fiduciary duty; (VI) aiding and abetting breach of fiduciary duty; and (VII) unjust enrichment. *Id.*

Gingold and Kilpatrick Townsend & Stockton, LLP then filed separate motions to dismiss the suit. [ECF Nos. 20, 21]. In late May 2014, the Foundation and the BRDF entered into an Amendment to Assignment Agreements to change their choice of law from New Mexico to the District of Columbia. Amendment to Assignment Agreements [ECF No. 29-5]. Thereafter, while the motions to dismiss were pending, the Foundation moved to supplement its Complaint to include the Amendment to Assignment Agreements. Mot. for Leave [ECF No. 29]. The attached Supplemental Complaint included a single additional paragraph,

> On May 27, 2014, the BRDF executed another assignment, acknowledging that, having previously assigned to the Foundation "all rights, title and interest the Fund has or may have under the laws of the State of New Mexico in any fees, costs, expenses or moneys paid by or paid to counsel for the Plaintiff class," the BRDF amends its prior assignments "to assign and transfer to the Foundation any and all rights, title and interests the Fund has or may have with respect to the subject matter of" its earlier assignments "under the laws of the District of Columbia." A copy of this assignment is attached to this Complaint as Exhibit D.

Supplemental Complaint ¶ 71 [ECF No. 29-1]. Finally, on June 11, 2014, the Foundation dismissed Kilpatrick Townsend & Stockton, LLP as a defendant, leaving Gingold as the sole remaining defendant. Stip. of Dismissal [ECF No. 30].

## STANDARDS OF REVIEW

### I.     <u>Legal Standard to Supplement a Pleading Pursuant to Rule 15(d)</u>

In general, a supplemental complaint may be used

to set forth new facts that update the original pleading or provide the basis for additional relief; to put forward new claims or defenses based on events that took place after the original complaint or answer was filed; [and] to include new parties where subsequent events have made it necessary to do so.

*BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 24 (D.D.C. 2015) (citations omitted). However, before filing a supplemental complaint, a plaintiff must request permission from the Court. Fed. R. Civ. P. 15(d).

Federal Rule of Civil Procedure 15(d) states that "[o]n motion and reasonable notice, the court may, on just terms, permit a party" to supplement its pleading based on transactions that have occurred after the date of the pleading to be supplemented. Thus, the decision to grant leave to supplement a pleading under Rule 15(d) is discretionary and may be granted where it serves the interests of judicial economy and convenience. *Banks v. York,* 448 F. Supp. 2d 213, 214 (D.D.C. 2006); *Jones v. Bernanke*, 685 F. Supp. 2d 31, 35 (D.D.C. 2010). Such leave should be freely given. *Hall v. CIA,* 437 F.3d 94, 100 (D.C. Cir. 2006); *Wildearth Guardians v. Kempthorne*, 592 F. Supp. 2d 18, 23 (D.D.C. 2008) (citing *Willoughby v. Potomac Elec. Power Co.,* 100 F.3d 999, 1003 (D.C. Cir. 1996)).

Even though leave to supplement should be freely granted, leave should be denied when there is good reason to the contrary. *Willoughby,* 100 F.3d at 1003. Futility is one such example. *Id.* "A proposed supplement to a complaint is futile if it would not survive a motion to dismiss." *Buaiz v. United States*, 1:06-cv-1312, 2007 WL 666468, at *1 (D.D.C. Mar. 5, 2007) (citing *Howard v. Evans,* 193 F. Supp. 2d 221, 226 n.2 (D.D.C. 2002)). Thus, "in deciding whether to grant or deny a motion to supplement, the Court may consider the merits of the proposed new pleading." *Burka v. Aetna Life Ins. Co.,* 945 F. Supp. 313, 317 (D.D.C. 1996). It is the opposing party's burden to demonstrate why leave should not be granted. *LaPrade v. Abramson*, 1:97-cv-

10, 2006 WL 3469532, at *3 (D.D.C. Nov. 29, 2006) (citing 3 James Wm. Moore *et al., Moore's Fed. Prac.* § 15.15[3] (3d ed.1999))

## II.    <u>Standard of Review for Motion to Dismiss Under Rule 12(b)(1)</u>

Lack of Article III standing is a defect in subject matter jurisdiction. *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541-42 (1986); *O'Shea v. Littleton,* 414 U.S. 488, 493-95 (1974). "A motion to dismiss under Rule 12(b)(1) challenges the court's power to hear a case." *Badgett v. District of Columbia*, 925 F. Supp. 2d 23, 28 (D.D.C. 2013). A Rule 12(b)(1) motion "may raise either a 'facial' or a 'factual' challenge to the non-moving party's claim of subject matter jurisdiction." *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). When a defendant lodges a "facial" challenge to the legal adequacy of the plaintiff's jurisdictional allegations, the "court must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in [its] favor, and dispose of the challenge accordingly." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). "When challenged on the issue, the party asserting subject-matter jurisdiction bears the burden of establishing that the court does in fact have subject-matter jurisdiction over the dispute." *Badgett*, 925 F. Supp. 2d at 28.

## III.    <u>Standard of Review for Motion to Dismiss Under Rule 12(b)(6)</u>

Rule 8 of the Federal Rules of Civil Procedure mandates that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). When a party invokes Rule 12(b)(6) to challenge a complaint for failing to state a claim for relief pursuant to Rule 8, the Court must assess the complaint to determine whether it contains sufficient facts that, when accepted as true, evidence a claim that is "plausible on its

face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

## ANALYSIS

Gingold raises a plethora of arguments as to why the Foundation's various claims should be dismissed: 1) the Court lacks prudential and Article III jurisdiction; 2) the claims are time-barred; 3) the Foundation's declaratory relief count is duplicative of its breach of contract claims; 4) the Foundation fails to state a claim for breach of contract; 5) the Foundation fails to state a claim for tortious interference with contract; 6) the Foundation fails to state a claim for breach of fiduciary duty; 7) the Foundation fails to state a claim for aiding and abetting a breach of fiduciary duty; and 8) the Foundation fails to state a claim for unjust enrichment.

Concurrently, the Foundation seeks leave to supplement its complaint to reflect the Amendment to Assignment Agreements executed between the Foundation and the BRDF,

changing their prior choice of law provision from New Mexico to the District of Columbia. *See generally* Mot. for Leave [ECF No. 29]. The Foundation asserts that such a change will serve to "simplify[] the resolution of the parties' litigation." *Id.* at 3. Gingold opposes the motion and contends that the Court should deny the plaintiff's request for a number of reasons: 1) the 2014 Assignment is "facially invalid;" 2) the District of Columbia does not recognize the "wholesale assignment of fiduciary rights"; 3) claims asserting breach of fiduciary duty are not transferrable between parties with conflicting interests; and 4) the proposed supplemental complaint fails to consider the Stipulation of Dismissal with Prejudice of Claims against Defendant Kilpatrick Townsend & Stockton LLP. *See generally* Gingold Opp'n [ECF No. 32]. Ultimately, Gingold's arguments amount to a multi-part "futility" objection on the basis that the proposed supplemental complaint would not survive a motion to dismiss.

As the Court is permitted to consider the merits of the proposed pleading and Gingold has already filed a motion to dismiss, which at times presents overlapping arguments, the Court will address both motions concurrently, first resolving the threshold issues of prudential and Article III standing, then moving to Gingold's Rule 12(b)(6) arguments, and finally ending with any remaining futility assertions in its analysis of the Foundation's Motion for Leave to File Supplemental Complaint. *See Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004) (citing *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 96-102 (1998) (Article III standing must be resolved as threshold matter)); *also Cmty. First Bank v. Nat'l Credit Union Admin.,* 41 F.3d 1050, 1053 (D.C. Cir. 1994) (prudential standing is a "qualifying hurdle that plaintiffs must satisfy.").

## I.     Standing and The Court's Jurisdiction Over The Claims

Gingold argues that the Foundation's lawsuit is not viable because the Foundation lacks both prudential and Article III standing. Reply at 2-21 [ECF No. 31]. The Supreme Court recently addressed prudential considerations as a "branch of standing,"

> not derived from Article III and "not exhaustively defined" but encompassing (we have said) at least three broad principles: "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (quoting *Elk Grove Unified School Dist. v. Newdow,* 542 U.S. 1, 12 (2004)). Article III standing, on the other hand, refers to those matters that meet the "Cases" and "Controversies" requirements established in Article III, Section 2, Clause 1 of the United States Constitution. *Lujan,* 504 U.S. 555, 560 (1992). While the Court must find Article III standing before considering the merits of any given case, "it is entirely proper to consider whether there is prudential standing while leaving the question of constitutional standing in doubt, as there is no mandated sequencing of jurisdictional issues." *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 179 (D.C. Cir. 2012) (citation and internal quotation omitted).

### A.  Prudential Standing

Gingold asserts that the *Cobell* Representatives repudiated their assignment to the BRDF when they assented to the *Cobell* Settlement Agreement. Reply at 7. It follows then, he argues, that the BRDF did not have any rights to ultimately assign to the Foundation and therefore the Foundation lacks prudential standing to bring any claims regarding the fee award.[7] *Id.*

---

[7] While Gingold does not identify those claims, the Foundation brings counts III through VII as an assignee of the BRDF.

To repudiate a contract, a party must communicate "by word or conduct, unequivocally and positively its intention not to perform." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1005 (D.C. 2008). Gingold frames his argument as one based on "facial[] invalid[ity],"[8] Gingold Opp'n at 2-3 [ECF No. 32], and points to Section M of the *Cobell* Settlement Agreement, which states:

> 1.  No Assignment.  Class Representatives represent and warrant that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim or any portion thereof or interest therein, including, but not limited to, any interest in the Litigation or any related action.

Settlement Agreement § M(1), *Cobell*, 1:96-cv-1285 (Dec. 10, 2010) [ECF No. 3660-2]. Gingold then asserts that "[b]y consenting to the terms and conditions of the Settlement Agreement, the *Cobell* Representatives communicated, by word or conduct, unequivocally and positively its [sic] intention not to honor the 1998 Assignment." Reply at 7 [ECF No. 31] (internal quotation marks omitted).

Section M(1), however, is limited to the assignment of "claim[s]" and does not implicate or expressly disavow the assignment of rights to legal fees. Settlement Agreement at 52, *Cobell*, 1:96-cv-1285 (Dec. 10, 2010) [ECF No. 3660-2]. This is further supported by the existence of a separate settlement contract that explicitly addressed legal fees. *Id.* Agreement on Attorneys' Fees, Expenses and Costs ("Fee Agreement") [ECF No. 3660-16]. Moreover, the Fee Agreement did not incorporate the "No Assignment" clause of the Settlement Agreement. Instead, it expressly incorporated only the "defined terms," *id.* at 2, and conclusively states that "[n]othing in this Fee Agreement shall affect the right of any non-party to this Fee Agreement," *id.* at 3.

---

[8] Because the Court addresses Gingold's standing arguments here it will not address them again *infra* in the section addressing the Motion for Leave to File Supplemental Complaint.

Additionally, the Settlement Agreement includes Section M(2), establishing that "[t]he Parties understand and agree that neither this Agreement, nor the negotiations that preceded it, shall be used as evidence with respect to the claims asserted in the Litigation, the propriety of a class action, *or in any other proceeding or dispute* except to enforce the terms of this Agreement." Settlement Agreement at 52, *Cobell*, 1:96-cv-1285 (Dec. 10, 2010) ECF No. 3660-2 (emphasis supplied). Thus, Section M(2) prohibits Gingold from using any portion of the Settlement Agreement as evidence in this separate matter.

The Foundation has alleged that "[t]o facilitate repayment to the Foundation, the four named plaintiffs, including Ms. Cobell, assigned to the BRDF 'all rights to any attorney's fees and/or costs and/or expenses of the [Indian Trust Fund] Litigation … recovered from the United States, whether pursuant to judgment or to settlement.'" Compl. ¶ 33. The Court credits the Foundation's allegations and draws all reasonable inferences therefrom. *Valentin*, 254 F.3d at 363. As a result, the Court concludes that the Foundation's allegations satisfy the Court's prudential concerns and the Foundation, on the face of its allegations, is not improperly violating the "general prohibition on a litigant's raising another person's legal rights" as it may bring claims that were assigned by the Class Representatives to the BRDF and from the BRDF to the Foundation. *Lexmark Intern., Inc.*, 134 S. Ct. at 1386 (2014). The defendant's Motion to Dismiss is denied in this respect.

### B. Article III Standing

To meet the Constitution's "Cases" and "Controversies" requirement and attain Article III standing, the Foundation needs to "demonstrate that [it] has suffered injury in fact, that the injury is fairly traceable to the actions of [the defendant], and that the injury will likely be redressed by a favorable decision." *BP Energy Co. v. Fed. Energy Regulatory Comm'n*, 828 F.3d

959, 963 (D.C. Cir. 2016) (citations omitted). Gingold argues that the Foundation does not have Article III standing for three reasons: 1) the allegations asserted against Gingold do not constitute "an invasion of a legally protected interest"; 2) any injury asserted by the Foundation cannot be attributed to any acts or omissions by Gingold; and 3) the Foundation's claims are not redressable by the Court. Reply at 9, 11 [ECF No. 31].

### 1. *Injury in Fact*

Gingold asserts that the Foundation's claims against him are of "no legal significance," and therefore the Foundation does not have a "legally protected interest," because the Foundation's claims are unenforceable due to Gingold's ethical obligation not to share fees with non-lawyers. *Id.* at 9-10.[9]

In support of his argument, Gingold cites *Boyd v. Farrin*, 958 F. Supp. 2d 232 (D.D.C. 2013) wherein Judge Lamberth dismissed certain claims when he held that the plaintiffs lacked standing because they did not have a "legally protected interest" in compensation from an underlying class action settlement. *Boyd*, however, is simply inapposite to the situation at bar. The *Boyd* plaintiffs were the National Black Farmers Association and its president, John Boyd. *Id.* at 235 Their claims, based on their dedication and hard work toward resolution of the underlying suit, "revolve[d] around the assertion, express or implicit, that defendants injured them by failing to request compensation for them from the [underlying class action] Court." *Id.* at 238. The court first noted that neither plaintiff qualified for compensation as a plaintiff in the underlying class action. *Id.* It then determined that the plaintiffs were also excluded from the settlement's attorneys' fees pool because fees awarded under fee-shifting statues were not

---

[9] District of Columbia Rule of Professional Conduct 5.4(a) states that "a lawyer or law firm shall not share legal fees with a nonlawyer."

available to non-lawyers. *Id.* Without a legitimate claim for fees or damages, the court held that the plaintiffs could not show injury-in-fact and therefore lacked standing to bring claims for failure to request compensation from the underlying class action court. *Id.*

In contrast, here, the Foundation alleges that it advanced funds to support the *Cobell* litigation pursuant to a contract through which it was to be paid back from any award of costs, expenses, or fees. The Foundation does not base its claims on an assertion that the defendant should have requested attorney's fees to be paid directly to the Foundation through the Court in *Cobell* due to the Foundation's hard work and dedication to the cause. Rather, it asserts that 50% of any fees, costs, or expenses collected by the defendants were to be used to repay the Foundation's investment either through its contract with Gingold or in equity. Of course, the Foundation has not only brought its contract claims directly against Gingold as a party to the Grant Agreements, but also as an assignee of the *Cobell* Representatives.

Additionally, the District of Columbia has opined in a similar situation that even if a contract or arrangement violated the District's ethical rules against fee-splitting with non-lawyers, the court would not "bestow a windfall" on lawyers trying to void such obligations. *Landise v. Mauro*, 725 A.2d 445, 451-52 (D.C. 1998); *see also Emmons v. State Bar of California*, 6 Cal. App. 3d 565 (1970) (cited with approval by D.C. Bar Op. 329, finding that fee splitting with bar referral service was permissible because the "association seeks not individual profit but the fulfillment of public and professional objectives. It has a legitimate, nonprofit interest in making legal services more readily available to the public."). Likewise, the Court will not "bestow a windfall" on Gingold here.

The prohibition against fee-sharing is intended "to protect the lawyer's professional independence of judgment." Comment [1] to D.C. Rule 5.4.[10] Recognizing that not all financial arrangements giving the appearance of fee-sharing compromise an attorney's judgment, District of Columbia Rule of Professional Conduct 5.4 provides several exceptions to the broad rule that "a lawyer or law firm shall not share legal fees with a nonlawyer." One of those exceptions is particularly relevant here:

> (5) A lawyer may share legal fees, whether awarded by a tribunal or received in settlement of a matter, with a nonprofit organization that employed, retained, or recommended employment of the lawyer in the matter and that qualifies under Section 501(c)(3) of the Internal Revenue Code.

Rule 5.4(a)(5). The D.C. Bar Committee addressed its rationale for exception (5) in its comments to the Rule:

> Subparagraph (a)(5) permits a lawyer to share legal fees with a nonprofit organization that employed, retained, or recommended employment of the lawyer in the matter. A lawyer may decide to contribute all or part of legal fees recovered from the opposing party to a nonprofit organization. Such a contribution may or may not involve fee-splitting, but when it does, the prospect that the organization will obtain all or part of the lawyer's fees does not inherently compromise the lawyer's professional independence, whether the lawyer is employed by the organization or was only retained or recommended by it. A lawyer who has agreed to share legal fees with such an organization remains obligated to exercise professional judgment solely in the client's best interests. Moreover, fee-splitting in these circumstances may promote the financial viability of such nonprofit organizations and facilitate their public interest mission.

Rule 5.4, Cmnt. [11]. Because neither the Foundation nor the BRDF employed, retained, or recommend Gingold, Rule 5.4(a)(5) and Comment 11 are not dispositive. However, the Rule and its comments reflect a clear stance by the Committee that the public policy and professional

---

[10] Other potential concerns raised by fee-sharing are the unauthorized practice of law by nonlawyers and the potential for compromise of client confidences. Neither of these concerns are implicated here.

independence concerns of Rule 5.4(a) are not implicated when fees are shared with a non-profit, and more explicitly, a 501(c)(3) organization.

In Ethics Opinion 329, from which exception (5) sprouted, the D.C. Bar Committee evaluated and sanctioned a similar arrangement to those of the Grant Agreements here. D.C. Bar Legal Ethics Op. 329 (2005). There, a nonprofit organization paid an attorney an annual retainer of $10,000 in exchange for a promise from the attorney that the $10,000 would be repaid from the first $10,000 the attorney received in contingent fees. *Id.* The Committee made clear that when the fee arrangement with the non-profit is limited to the recouping of out-of-pocket costs, and not otherwise tied to the amount of fees collected by the attorney in the representation of a particular client, the sharing of fees is ethical. *Id.*[11]

On February 1, 2007, the District of Columbia Court of Appeals amended the D.C. Rules of Professional Conduct to formally incorporate the principles of Opinion 329. In doing so, the court elected to go one step further and expand upon the exception described in Opinion 329 – to allow an attorney to share an unlimited amount of fees with a non-profit, un-anchored to the nonprofit's out-of-pocket expenses. Such further broadening of the fee-sharing exception suggests to the Court that while the situation at bar has not been directly addressed by the District of Columbia Court of Appeals, that court would either find the Grant Agreements at issue here to be consistent with "promot[ing] the financial viability of [] nonprofit organizations and facilitat[ing] their public interest mission making legal services more readily available to the

---

[11] Additionally, the Ethics Committee has explicitly "counseled against an unduly broad reading of Rule 5.4(a)." D.C. Bar Legal Ethics Op. 233 (1993); D.C. Bar Legal Ethics Op. 351 (2009) ("the Virginia Bar's ethics committee has said that 'application of Rule 5.4(a) must move beyond a literal application of language of the provision to include also consideration of the foundational purpose for that provision.'") (quoting Va. Legal Ethics Op. 1783 (2003)).

public," or as discussed below, determine that the Grant Agreements are not fee-sharing agreements at all. Rule 5.4, Cmnt. [11].

Here, if the plaintiff's allegations are credited, which they must be, the Grant Agreements establish that Gingold agreed to pay the BRDF one half of any attorney's fees and/or costs and/or expenses of the Litigation until the grant is repaid in full. Compl. ¶ 65. While the Foundation did not employ, retain, or recommend Gingold, the Grant Agreements here likely did not interfere with Gingold's professional judgment in the *Cobell* litigation. As attorneys' fees are generally collected from the class pool, the Grant Agreements are consistent with a class action plaintiffs' attorney's incentive to maximize the value of the class claim. The larger the pool, the better result for all.

Finally, the Court will not refuse to recognize the Grant Agreements because the Agreements are akin to a lender making a loan to a law firm under an arrangement to secure that loan with part of the lawyer's contingency fees. Such arrangements have been enforced in courts around the country and indeed are often not even considered fee-sharing agreements. *See, e.g., Hamilton Capital VII, LLC, I v. Khorrami, LLP*, No. 650791/2015, 2015 WL 4920281 (N.Y. Sup. Ct. Aug. 17, 2015) (Holding that NY Rule 5.4 does not prohibit the sharing of legal fees with a lender who has a security interest in contingency fee agreement(s))[12]. The *Hamilton* court stated:

> Courts have expressly permitted law firms to fund themselves in this manner. Providing law firms access to investment capital where the investors are effectively betting on the success of the firm promotes the sound public policy of making justice accessible to all, regardless of wealth. Modern litigation is expensive, and deep pocketed wrongdoers can deter lawsuits from being filed if a plaintiff has no means of financing her or his case. Permitting investors to fund firms by lending

---

[12] "[P]ublic policy favors this type of financing because it allows lawsuits to be decided on their merits, and not based on which party has deeper pockets." *Hamilton Capital VII, LLC, I*, 2015 WL 4920281, at *2 (citations omitted).

> money secured by the firm's accounts receivable helps provide victims their day in court. This laudable goal would be undermined if the Credit Agreement were held to be unenforceable. The court will not do so.

*Id.* The Court agrees and holds that the Foundation has properly plead an injury-in-fact and that its claims are not barred by ethical considerations.

### a. The Plain Language of the Assignment

In a separate section under the umbrella of standing, Gingold argues that the plain language of the Assignment Agreement between the *Cobell* Class Representatives and the BRDF does not generate standing for the Foundation. He argues that the Class Representatives did not assign any breach of fiduciary duty claims to the BRDF and therefore the BRDF cannot assign those claims to the Foundation to bring here. Gingold states that the "assignments between those four individuals and [the] BRDF are limited in nature and scope and do not purport to assign even the entirety of their right to attorneys' fees to [the] BRDF." Mot. to Dismiss at 21 [ECF No. 20]. Rather, he argues, the Class Representatives limited their assignments as individuals to the BRDF to certain attorneys' fees that they recovered from the United States as a result of the *Cobell* Litigation. *Id.* at 22. Again, the Assignment states in total as follows:

> This assignment is made between the Blackfeet Reservation Development Fund ("Fund") and Elouise Pepion Cobell, Earl Old Person, Thomas Maulson, and James Louis Larose.
>
> In consideration of payment by the Fund of certain fees and expenses incurred in relation to Civil Action 96-01285 in the United States District Court for the District of Columbia ("the Litigation"), an action in which each of the undersigned is a plaintiff, each of the undersigned assigns to the Fund *all rights* to any attorney's fees and/or costs and/or expenses of the Litigation, recovered from the United States, whether pursuant to judgment or to settlement, that the undersigned recovers as a result of the Litigation.

Assignment [ECF No. 29-3] (emphasis supplied).

Contrary to Gingold's interpretation of this language, the Court finds that the inclusion of the words "all rights" encompasses a breach of fiduciary duty claim. "All rights" broadens the

Assignment from only attorneys' fees to all causes of action related to those fees. Gingold's reading of the assignment essentially ignores the inclusion of that phrase, something the Court will not do. *GenopsGroup LLC v. Pub. House Inv. LLC*, 67 F. Supp. 3d 338, 343 (D.D.C. 2014) ("When interpreting a contract, the Court must 'strive to give reasonable effect to all its parts and eschew an interpretation that would render part of it meaningless or incompatible with the contract as a whole.'") (quoting *District of Columbia v. Young*, 39 A.3d 36, 40 (D.C. 2012)). The Court finds that the Foundation has standing to assert its claims and denies the defendant's motion in this respect.[13]

### 2. *Causation*

Gingold also asserts that the Foundation fails to plead adequate facts to show that its injuries were "caused by" or "fairly traceable" to his actions. Reply at 11 [ECF No. 31]. Gingold does not cite any case law in support of his two paragraph argument.

The Foundation alleges that Gingold signed the Grant Agreements as "lead counsel" after "extensive negotiations … to ensure that reimbursement of the Foundation be guaranteed as long as the plaintiffs or their attorneys received a sufficient award of attorney's fees or expenses, or costs." Compl. ¶¶ 34-35. The Foundation also alleges that each of the seven Grant Agreements are valid and binding contracts among the Foundation, the BRDF, and Gingold. *Id.* ¶ 80. The Foundation goes on to allege that on July 27, 2011, the Court issued an order granting final approval of the *Cobell* settlement, including allocation of $85.4 million of the $99 million

---

[13] To the extent that Gingold asserts in passing that the *Cobell* Representatives only assigned these claims as individuals and did not have the authority to assign claims belonging to the Class, the Court disagrees. At the time the *Cobell* Representatives executed this Assignment, the Class had been certified and the named plaintiffs were charged with "fairly and adequately protect[ing] the interests of the class." Fed. R. Civ. P. 23(a)(4). The Assignment is signed by all named plaintiffs and it addresses the entirety of "any attorney's fees and/or costs and/or expenses of the Litigation recovered." Assignment [ECF No. 29-3].

awarded in attorneys' fees, that the $85.4 million was then distributed to class counsel including defendant Gingold, that Gingold refused to recognize any obligation to reimburse the grants from the attorneys' fee award, and finally, that Gingold's refusal to pay any funds to the BRDF or the Foundation, directly or as an assignee of the BRDF, is a breach of the Grant Agreements which has damaged the Foundation. *Id.* ¶¶ 57-58, 62, 84-85, 88-90. The Court finds that the Foundation has sufficiently alleged injury caused by Gingold.

### 3. *Redressability*

Gingold asserts broadly that "for this Court to enforce the underlying action, it would have to invalidate one of the 'material terms' in the Settlement Agreement and concomitantly, undermine the Fee Agreement, the [Claims Resolution Act of 2010], and its own orders rendered during the Fairness Hearing and in the Final Order." Reply at 21 [ECF No. 31]. It follows, Gingold argues, that the Court can therefore not redress the Foundation's alleged injury, or in other words, the Court cannot enforce equitable relief or damages. The Court denies Gingold's motion in this respect for the following reasons.

"Redressability focuses on the requested relief." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 170 F. Supp. 3d 6, 14 (D.D.C. 2016) (citation omitted). The Foundation has requested monetary damages in six counts and declaratory relief in one.[14] Of those six counts requesting monetary damages, Count II, breach of contract, is brought by the Foundation directly as an intended beneficiary of the Grant Agreements. Count III, breach of contract, Count IV, intentional interference with contractual relations, Count V, breach of fiduciary duty, and Count VI, aiding and abetting breach of fiduciary duty, are brought by the Foundation in its capacity as

---

[14] As the Court dismisses the Foundation's Declaratory Judgment count as duplicative below, the Court will not address it here.

an assignee of the *Cobell* plaintiffs. The Foundation brings Count VII, unjust enrichment, in equity and in the alternative to Counts II and III.

Gingold does not address Count II, breach of contract, in his argument and the Court is not presented with any reason why a jury would not be able to award monetary relief based on contract. Additionally, as the Court made clear above, the Settlement Agreement's "No Assignment clause," Section M(1), is limited to the assignment of "claims" and does not implicate legal fees which were addressed in a separate Fee Agreement. Settlement Agreement at 52, *Cobell*, 1:96-cv-1285 (Dec. 10, 2010) [ECF No. 3660-2]; Fee Agreement [ECF No. 3660-16]. Thus, contrary to Gingold's argument, the Court may award damages or equitable relief for the plaintiff without "undermining" or "invalidating" prior orders, agreements, or law with respect to any claims that derive from assignments from the *Cobell* Representatives.

## II.     Timeliness of The Foundation's Claims

Gingold also raises a statute of limitations argument by adopting and incorporating prior defendant Kilpatrick Townsend & Stockton, LLP's argument that the Foundation's claims are "time-barred because the three-year statute of limitations began running no later than early 2006, when part payment was made on the disputed debt." Mot. to Dismiss at 2, n.2 [ECF No. 20]. For the reasons that follow the Court denies Gingold's Motion in this respect.

When the Court hears a case under diversity jurisdiction it applies the choice-of-law rules of the forum state, here, the District of Columbia. *Seed Co. Ltd. v. Westerman*, 832 F.3d 325, 331 (D.C. Cir. 2016) (citing *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995)). The District of Columbia's choice-of-law rules then require the Court to apply the District's own statutes of limitation. *Id.*; *see also Huang v. D'Albora*, 644 A.2d 1, 4 (D.C. 1994) ("A limitation on the time of suit is procedural and is governed by the law of the forum.")

(citation omitted). Section 12-301 of the D.C. Code establishes a three-year statute of limitations for contract and tort claims. DC ST § 12-301(7)-(8).

In an action for breach of contract, a cause of action accrues and the statute of limitations begins to run at the time of the breach. *Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011). A contract is breached when a party, who otherwise has no excuse, fails to perform all or any part of what it promised. *Id.* Gingold argues that the limitations period began running at the latest when he last made partial payment to the Foundation in 2005 or, alternatively after each fee award. Mot. to Dismiss at 2, n.2 [ECF No. 20]; Reply at 22-23 [ECF No. 31].

On December 19, 2005, Judge Lamberth granted the *Cobell* Class' petition for interim attorneys' fees and expenses. *Cobell v. Norton,* 407 F. Supp. 2d 140, 177 (D.D.C. 2005). The Court awarded the *Cobell* Class $7,066,471.05, with $4,534,275.97 representing attorneys' fees and $2,532,195.08 in expenses. *Id.* The Foundation alleges that after some back and forth between Gingold and the Foundation, Gingold agreed that "the 'broad language' of the grant agreements entitled the Foundation to repayment of its pro rata share of up to one-half of the entire $7,066,471.05 interim award, including the sum allocated to attorneys' fees." Compl. ¶¶ 42-44. Ultimately, after additional negotiation, Gingold repaid the Foundation $1,884,392.28, representing the Foundation's pro rata share of the interim award, but only for the initial $2 million grant.[15] *Id.* ¶ 45. This left the current outstanding balance of $4,540,607.72. *Id.* ¶ 46. The Complaint does not include the date upon which this agreement was reached or when payment was made.

---

[15] Two other nonprofit organizations also provided funds to the BRDF. Their contributions were considered in the calculations. Compl. ¶ 14, n.2.

Nonetheless, the Foundation counters and argues that while it did receive partial payment from the interim award discussed above, each time Gingold failed to repay the Foundation, a "fresh breach of the grant agreements and a fresh injury to the Foundation occurs, giving rise to a new claim by the Foundation, and causing the limitations period to begin anew." Opp'n at 8-9 [ECF No. 28]. The Foundation is correct.

It is settled law in the District of Columbia that where a contract requires payment in distinct intervals or installments, any wrongful act or breach of that intermittent duty gives rise to a separate cause of action and therefore a separate limitations period. *Klayman v. Barmak*, 634 F. Supp. 2d 56, 64 (D.D.C. 2009); *Union Labor Life Ins. Co. v. Sheet Metal Workers Nat. Health Plan*, 1991 WL 212232, at *5 (D.D.C. Sept. 30, 1991); *Bembery v. District of Columbia*, 758 A.2d 518, 520 (D.C. 2000); *Keefe Co. v. Americable Int'l, Inc.*, 755 A.2d 469, 472 (D.C. 2000). A contract need not be labeled or otherwise designated as an "installment" contract for the principle to apply. The court looks to the "nature of the obligation." *Keefe Co.*, 755 A.2d at 474 ("applying installment obligation rule to contract which created 'no fixed amount to be paid out over time ... but rather a continuing obligation to pay a portion of the profits and royalties on [the song the plaintiffs sold thirty years prior] as the recording gets used over time'"), *as amended on denial of reh'g and reh'g en banc* (June 15, 1998) *cert. denied,* 525 U.S. 983 (1998)) (citation omitted). Here, the Grant Agreements each state "one-half of *any* attorney's fees and/or costs and/or expenses of the Litigation ... shall be paid to the Grantee, *until the grant is repaid in full*." Compl. ¶¶ 4, 34, Ex.'s A, B (emphasis supplied). Thus, any time the Court awarded fees, costs, or expenses, half of that value was to be repaid to the Foundation until the grants were repaid. While these payments are not fixed in amount or regularity, the duty to make payment

nonetheless arises each time funds are received and is not discharged until all funds supplied are repaid.

On July 27, 2011, the Court issued an order granting final approval of the *Cobell* Settlement, allocating $85.4 million of the $99 million in attorneys' fees to the defendant and his co-counsel. Compl. ¶ 57. The Foundation alleges that Gingold and his co-counsel received their fees between November 7, 2012 and December 4, 2012. *Id.* ¶ 58. After correspondence between the Foundation and Gingold, Gingold refused to recognize any obligation on his part to pay any of the attorneys' fees award to the Foundation. *Id.* ¶ 62. The Foundation then brought this suit on July 16, 2013, less than two years after the Court's final approval of the fee award and within nine months of defendant's receipt of attorneys' fees. *See generally Id.*

Of course, the defendant's reliance on the statute of limitations is an affirmative defense. *Smith v. Washington Post Co.*, 962 F. Supp. 2d 79, 86 (D.D.C. 2013). In light of that, courts in this Circuit have held numerous times that dismissal on statute of limitations grounds based only on the face of the complaint is disfavored. *Id.* Dismissal is proper only if the allegations in the complaint conclusively time-bar the suit. *Id.*

Here, the allegations in the Complaint do not conclusively time-bar the suit. While the Foundation agreed to accept less than what it arguably was entitled to after the $7,066,471.05 interim award – more than three years before it filed suit – it also alleges that Gingold failed to pay the remainder of the outstanding balance on the grants after the Court approved Gingold's fee award in 2011 or actual payment of that award in 2012. *See* Compl. ¶¶ 40-63. That award and its payment both occurred within three years of the date the Foundation filed this suit. Construing all reasonable inferences in favor of the plaintiff, the Foundation has alleged that the defendant breached the terms of the Grant Agreements and wrongfully failed to repay the grants on at least

one distinct occasion in the three years preceding the Complaint. The defendant's motion is denied in this respect.

### III.  Rule 12(b)(6) Challenges

The Court now turns to Gingold's assertions that the Foundation has failed to properly state its various claims.

#### A.  Failure to State a Claim: Counts II and III - Breach of Contract

Gingold contends that the Foundation failed to state its breach of contract claims because: 1) he is not a party to the Grant Agreements; 2) the Foundation provided no consideration for his acknowledgments; 3) an "acknowledgment" does not equate to a guarantee; and 4) even if contracts were created that bound him, conditions precedent have not been satisfied. Mot. to Dismiss at 9-19 [ECF No. 20]. "To state a claim for breach of contract so as to survive a Rule 12(b)(6) motion to dismiss, it is enough for the plaintiff to describe the terms of the alleged contract and the nature of the defendant's breach." *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015) (citing *Nattah v. Bush,* 605 F.3d 1052, 1058 (D.C. Cir. 2010)). "A valid and enforceable contract requires: 1) the express intention of the parties to be bound; 2) agreement to all material terms, and 3) the assumption of mutual obligations." *Millennium Square Residential Ass'n v. 2200 M St. LLC*, 952 F. Supp. 2d 234, 247 (D.D.C. 2013).

Because Gingold's first three challenges to the Foundation's contract claims focus on whether a valid contract has been formed, the Court will address these together.

##### 1.  *Contract Interpretation and Formation*

The parties do not dispute that the interpretation of the Grant Agreements is governed by District of Columbia law, which dictates that both the interpretation of an unambiguous contract and the determination of whether a contract is ambiguous are questions of law. *Abdelrhman v.*

*Ackerman*, 76 A.3d 883, 887 (D.C. 2013). Likewise, "[t]he determination whether an enforceable contract exists, when based on the contract documents, is a question of law." *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 116 (D.D.C. 2014) (citations omitted). The District of Columbia

> has long employed an objective law of contracts, meaning that the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.

*Abdelrhman*, 76 A.3d at 888 (internal quotation marks and citations omitted). Of course, "[a] contract is not rendered ambiguous merely because the parties disagree over its proper interpretation." *Parker v. U.S. Trust Co.*, 30 A.3d 147, 150 (D.C. 2011) (citation omitted).

Under the District's "objective" theory of contract interpretation, extrinsic evidence may be considered in two scenarios. First, in limited circumstances, extrinsic evidence may be evaluated in "determining whether *objectively* the meaning of the contract language is not susceptible of a clear and definite undertaking." *N.W. v. District of Columbia*, 107 F. Supp. 3d 141, 147 (D.D.C. 2015) (quoting *Abdelrhman*, 76 A.3d at 889 (D.C. 2013)). The District of Columbia Court of Appeals has recognized that it has "not been a model of clarity" when explaining the limits of such an inquiry, so the precise scope of this exception is, as yet, unknown. *Abdelrhman*, 76 A.3d at 888 (D.C. 2013). The court, however, has noted that a subset of its cases allow consideration of extrinsic evidence illuminating "all the circumstances" before, contemporaneous with, and after the making of an agreement. *Id.* at 888-89. Those circumstances include, "evidence of the general situation, the relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Id.* at 889. Extrinsic evidence may be a "useful aid[] in determining whether objectively the meaning of the contract language 'is not susceptible

of a clear and definite undertaking.'" *Id.* (citations omitted). Of course, "[i]t is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context." Restatement (Second) of Contracts § 212 (1981) cmnt. b. Second, and more traditionally, extrinsic evidence may be used to determine the parties' subjective intent after a document has been deemed ambiguous. *N.W. v. District of Columbia*, 107 F. Supp. 3d at 147.

As explained below, the Court concludes that extrinsic evidence is required to determine whether, objectively, the meaning of the contract language is "susceptible of a clear and definite undertaking." *Id.* In doing so, the Court denies Gingold's motion to dismiss as it cannot determine as a matter of law that the Foundation would not be entitled to relief under any facts or theories supported by the allegations in the Complaint. *Galderma Labs., L.P. v. Dimensional Healthcare, Inc.*, 4:06-cv-822-Y, 2007 WL 1703445, at \*3 (N.D. Tex. June 13, 2007) ("The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim. Thus, the Court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint.") (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 313 (5th Cir. 2002)).

The Grant Agreements contain three main headings, the third of which is titled "Grant Conditions." Compl. Ex. A. at 1 [ECF No. 1-2]. Within that heading, the Grant Agreements contain a subheading titled "Reversion of Grant Funds." *Id.* at 2. The fifth and sixth bullet points under "Reversion of Grant Funds" contain conditions expressly directed to Gingold. *Id.* at 3. The parties disagree on the meaning of the term "acknowledges" within the sixth condition. The condition states in full:

By his signature, Dennis M. Gingold, their lead counsel, *acknowledges* that one-half of any attorney's fees and/or costs and/or expenses of the Litigation recovered from the United States, by judgment or settlement, shall be paid to the Grantee, until the grant is repaid in full.

*Id.* at 3 (emphasis added) ("Acknowledgment Condition").

First, both parties maintain that the provision is unambiguous and point to dueling dictionary definitions of the disputed term. Gingold argues that the term "acknowledge" is not a synonym for "agree" or "promise" or "guarantee," but rather should be read to mean, as the first entry for "acknowledge" in *Black's Law Dictionary* defines it, "[t]o recognize (something) as being factual or valid." BLACK'S LAW DICTIONARY (10th ed. 2014). The Foundation, on the other hand, argues that the term has an accepted alternative definition, the second entry in *Black's Law Dictionary*, that defines acknowledge as "[t]o show that one accepts responsibility for." *Id.* Gingold responds that the latter definition should be limited to the paternity context, as that is the illustration used by *Black's Law Dictionary* for that definition.

In addition to the definitions given in *Black's*, the *American Heritage Dictionary* gives alternative definitions including "[t]o admit the existence or truth of" and "[t]o accept or certify as legally binding." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2015). The *Oxford English Dictionary* provides a definition it labels as "legal" which defines acknowledge to mean "[t]o own as genuine, or of legal force or validity; to own, avow, or assent, in legal form, to (an act, document, signature, etc.) so as to give it validity." OXFORD ENGLISH DICTIONARY (3d ed. 2009). Finally, *Merriam-Webster's Collegiate Dictionary* defines it as "to recognize the rights, authority, or status of," or "to disclose knowledge of or agreement with." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 10 (10th ed. 1998).

All of this to say that while it is helpful for courts to turn to dictionaries to aid in interpreting a disputed term, ultimately the construction of a term will depend on the context in

which the term is used "taking into account the contract as a whole." *Steele Found., Inc. v. Clark Const. Group, Inc.*, 937 A.2d 148, 154 (D.C. 2007); *see also MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 226 (1994) (noting that the Court does not rely exclusively on dictionary definitions, but also on contextual indications).

The Grant Agreements provide some context clues. As described above, the Acknowledgment Condition falls under the main heading of "Grant Conditions" and under the subheading of "Reversion of Grant Funds." If the Acknowledgment Condition merely meant that Gingold "recognizes the agreement as valid," the paragraph would serve little to no purpose as a "Grant Condition." *N.W. v. District of Columbia*, 107 F. Supp. 3d at 148 (D.D.C. 2015) (to determine what a reasonable person in the position of the parties would have thought the disputed language meant the Court "must consider the agreement as a whole, giving a reasonable, lawful, and effective meaning to all its terms.") (citation and quotations omitted); *United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 340 (D.C. Cir. 2014), *cert. denied,* 135 S. Ct. 2833 (2015) (noting that contracts should be interpreted so that no provisions are superfluous); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1302 (D.C. Cir. 1998) ("We assume that the parties intended for every part of the agreement to have meaning; interpretations that would render a portion of the agreement ineffective or mere surplusage are traditionally disfavored by courts.") (citation omitted). Indeed, the Acknowledgment Condition would not be a condition at all. The Court is reluctant to read such provision as non-binding surplusage.

There are, however, other factors that point to the non-binding nature of the Acknowledgment Conditions. As Gingold points out, the Foundation knew how to draft language that would more clearly create legal obligations. It did so elsewhere in the Grant Agreements. For example, under the same "Reversion of Grant Funds" subsection, the Grant

Agreements state "The Grantee will return all unexpended funds upon termination of the Litigation unless other arrangements have been made with the Foundation." Compl. Ex. A. at 2 [ECF No. 1-2]. Moreover, the Acknowledgment Condition does not state that Gingold "agrees," "guarantees," "promises to," or "will" repay any funds. The condition simply states that he "acknowledges" that the funds shall be repaid to the BRDF.

Gingold also asserts that no contracts were formed because he is not a "party" to the Grant Agreements. The agreements explicitly state in their first paragraph that each "Agreement . . . is made between the Lannan Foundation . . . and Blackfeet Reservation Development Fund, Inc." *Id.* at 1. Gingold argues that his omission from this list of parties necessarily excludes him from participation in the agreement. Gingold, however, undisputedly signed each agreement. His signature appears on each of the seven Agreements under the column "GRANTEE" and below the heading "Plaintiffs' Counsel." In the District of Columbia, when there is a signed, written contract, the signature satisfies the objective test and "indicates a mutuality of assent to which a party is bound unless he can show some special circumstance such as fraud, duress, or mutual mistake." *Watson v. Gold N Diamonds, Inc.*, 736 F. Supp. 2d 266, 269 (D.D.C. 2010). Gingold has not brought any potential "special circumstances" to the Court's attention.

Instead, Gingold avows that his signature does not render him personally liable, but is rather the signature of an agent of the *Cobell* Class. Restatement (Second) of Agency § 320 (1958) ("Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract.); *see also Robinson v. Deutsche Bank Nat. Trust Co.*, 932 F. Supp. 2d 95, 109 (D.D.C. 2013) (liability does not "attach to an agent of a disclosed principal for his act within the scope of the agency unless he binds himself by definite words or stipulation.") (citation omitted). It is not clear, however,

whether Gingold "b[ound] himself by definite words or stipulation" or "otherwise agreed" to become a party to the contract. As discussed above, the Agreements contain a specific clause directed at Gingold and he signed each agreement despite the signature of his disclosed principal. The words "Plaintiffs' Counsel" do not weigh so heavily that the Court can say, without more evidence, that Gingold was not a party to the agreements. Indeed, "Plaintiffs' Counsel" may simply indicate that Gingold has signed on behalf of all counsel for the Class, present and future, and not as an agent for the Class.

Finally, Gingold asserts that the Foundation provided no consideration for his acknowledgment. He argues that "[n]either [the Foundation] nor [the] BRDF promised anything to Gingold in exchange for his acknowledgment" and "there is no authority that holds that an acknowledgment by a non-party of terms and conditions to which the contracting parties have agreed binds that non-party to the parties' agreed upon terms." Mot. to Dismiss at 11-12 [ECF No. 20]. District of Columbia courts, however, "'will not inquire into the adequacy of' consideration, even where it is 'arguably slight,' as long as it is 'legally sufficient.'" *Washington Inv. Partners of Delaware, LLC v. The Securities House, K.S.C.C.*, 28 A.3d 566, 574 (D.C. 2011) (quoting *Riggs v. Aetna Ins. Co.*, 454 A.2d 818, 821 (D.C. 1983)). "An exchange of promises or a detriment to the promisee constitutes legally sufficient consideration, so long as it is bargained-for." *Id.* at 574-75 (internal quotation marks omitted); *accord Clay v. Chesapeake & Potomac Tel. Co.*, 184 F.2d 995, 996 (D.C. Cir. 1950). It does not matter "from whom the consideration moves or to whom it goes. If it is bargained for and given in exchange for the promise, the promise is not gratuitous." Restatement (Second) of Contracts § 71 (1981), cmnt. e. Thus, the inquiry is not necessarily whether Gingold was promised anything in exchange for his acknowledgment, but whether each party promised to "do something [the] party otherwise is

under no legal obligation to do, or to refrain from doing something [the] party has a legal right to do . . . ." *Eastbanc, Inc. v. Georgetown Park Assoc. II, L.P.,* 940 A.2d 996, 1003 (D.C. 2008) (citations omitted).

The Foundation promised to lend money to the BRDF to fund the *Cobell* litigation. If the Court finds that Gingold's "acknowledgment" was a promise to repay the funds, consideration exists. The Court, however, holds that it cannot make such a determination without reference to extrinsic evidence not available to it at this stage in the litigation. *Pernice v. Bovim*, 1:15-cv-541, 2016 WL 1626830, at *2 (D.D.C. Apr. 22, 2016) (when a court must examine extrinsic evidence to determine the meaning of a contract, such an inquiry is beyond the scope permitted at the motion to dismiss stage.) Thus, the Court cannot say as a matter of law that the Foundation has failed to state a claim based on the face of the Complaint and the documents attached thereto.

At this stage, the Court accepts all facts as alleged as true and construes all inferences in the light most favorable to the plaintiff. The Foundation's Complaint states a claim that Gingold breached a contractual obligation to repay money awarded in the *Cobell* suit. The Complaint refers to the relevant portions of the Grant Agreements and states that Gingold breached his obligations when he failed to pay the outstanding balance to the BRDF. Compl. ¶¶ 79-85. The Complaint contains sufficient factual allegations to state a claim for a breach of contract and Gingold's motion to dismiss on this basis is denied.

### 2. *Conditions Precedent*

Gingold next asserts that even if a valid contract was formed, the Foundation's breach of contract claims fail because conditions precedent have not been satisfied. Specifically, he argues that the language in the Acknowledgment Condition "recovered from the United States" creates a condition precedent that has not been satisfied – i.e. that the money paid to him and his co-counsel was not "recovered from the United States." Second, he argues that the Grant

Agreements dictate that they need only be repaid if the funds received in settlement were specifically earmarked as repayment for expenses paid with grant funds. The Court finds that the attorneys' fees paid to Gingold and his co-counsel were "recovered from the United States" and that the Grant Agreements do not limit their repayment requirement to only funds specifically reimbursed as expenses paid for by grant monies.

The fee award paid to Gingold and his co-counsel was money "recovered from the United States." Class counsel, presumably including Gingold himself, negotiated the Class Action Settlement Agreement with the United States Secretary of the Interior and Secretary of the Treasury. *See* Settlement Agreement at 1, *Cobell* [ECF. No. 3660-2]. Class counsel also negotiated the Agreement on Attorneys' Fees with an Associate Attorney General of the United States. *See* Defendants' Response to Plaintiffs' Notice Regarding Counsel Fees and Incentive Awards at 5 *Cobell,* 1:96-cv-1285 (D.D.C. Dec. 17, 2010) [ECF. No. 3664-1]. The Settlement Agreement and Agreement on Attorneys' Fees required an act of Congressional approval, the Claims Resolution Act of 2010, which was then signed into law by President Obama. Pub. L. No. 111-291, § 101(c)(1), 124 Stat. 3064, 3066. The money was paid from an account funded by the United States Treasury. Settlement Agreement at 26-27, *Cobell* [ECF. No. 3660-2].

While the Court was required to act as a fiduciary in approving the fee award, and the money may have otherwise have gone to the class members, the fee award nonetheless derived from the United States Treasury. To say otherwise would be to contort the words "recovered from" beyond all recognition and fail to recognize that the United States was the defendant in the *Cobell* case and paid to settle it. The Court finds that the attorneys' fees award constitutes money "recovered from the United States" and denies Gingold's motion in this respect.

Second, the Grant Agreements' repayment provisions do not limit the repayment requirement to *only* those scenarios where the funds are recovered in some sort of itemized form. Gingold relied on the phrase "if certain payments that were originally paid with funds from the grant are recovered." He argues that this phrase expressly ties the repayment of each Grant Agreement to the recovery of expenses or fees related specifically to each particular Grant Agreement. Mot. to Dismiss at 15. The Court disagrees. The language quoted above has been plucked from the "Amount" clause in the Grant Agreements. After identifying the amount of the grant, the second sentence of the clause states in full:

> As set out below, this grant shall be repaid, in part as set out below, if certain payments that were originally paid with funds from the grant are recovered, through successful litigation or negotiation.

Compl. Ex. A at 1 [ECF No. 1-2].

While the sentence is not a model of precision, the Court notes that it explicitly defers to additional clauses in the Grant Agreements for further expansion upon the repayment terms. Those repayment clauses have been discussed above and provide that the parties to the Grant Agreement will repay the grants out of "one-half of any attorney's fees and/or costs and/or expenses recovered from the United States." *See Volvo Powertrain Corp.*, 758 F.3d 330, 340 (D.C. Cir. 2014) (noting that contracts should be interpreted so that no provisions are superfluous); *GenopsGroup LLC*, 67 F. Supp. 3d at 343 (D.D.C. 2014) (applying a "familiar" principle of contract interpretation, that "specific terms and exact terms are given greater weight than general language.") (citations omitted). Thus, the Grant Agreements require payment under three scenarios, recovered costs, recovered expenses, and attorneys' fees. Certainly, as was the case here, if attorneys' fees were recovered they would be based on the Class Representatives' assertions regarding their attorneys' hard work, not itemized expenses or costs. The Agreements,

nonetheless, require repayment of the funds upon payment of attorneys' fees. The Court denies Gingold's motion in this respect.

### B. Failure to State a Claim: Count IV - Tortious Interference With Contractual Relations

Next, Gingold contends that he did not tortiously interfere with the Grant Agreements and that the Foundation has failed to state a claim for tortious interference. To state a claim for tortious interference with contract, a plaintiff must allege "four elements in the District of Columbia: (1) existence of a contract; (2) knowledge of the contract; (3) intentional procurement of breach by the defendant; and (4) damages resulting from the breach." *Dean v. Walker*, 876 F. Supp. 2d 10, 14 (D.D.C. 2012), *as amended* (July 10, 2012) (citations and quotations omitted). Gingold does not dispute that the Foundation has alleged the four elements above. Rather, Gingold asserts that his conduct was privileged and/or legally justified. Such a privilege exists when a defendant acts to protect an existing economic interest and if "he does not employ improper means." *Temps & Co. v. Finova Mezzanine Capital, Inc.*, 1:00-cv-1349, 2001 WL 503249, at *1 (D.D.C. May 9, 2001). To determine whether a defendant utilized "improper means," the District of Columbia looks to the factors supplied by the Restatement (Second) of Torts. *Onyeoziri v. Spivok*, 44 A.3d 279, 291 (D.C. 2012). The Restatement lists seven factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979). This standard is also met if the plaintiff shows malice, or spite. Said another way, "motive or purpose to disrupt ongoing business relationships is required to establish liability, not merely intent to interfere or knowledge that conduct will

harm plaintiff's business dealings." *Marshall v. Allison*, 908 F. Supp. 2d 186, 202 (D.D.C. 2012), *aff'd,* 554 F. App'x 20 (D.C. Cir. 2014) (citations and quotations omitted).

The Foundation has not alleged that Gingold refused to repay the Grant Agreements from his attorneys' fees out of ill will. The Foundation does, however, allege that Gingold breached his fiduciary obligations to the *Cobell* plaintiffs. Compl. ¶¶ 93-94. The Foundation further alleges that Gingold knew that the BRDF and the *Cobell* Representatives' ability to repay the Grant Agreements through the attorneys' fees award would require cooperation of class counsel, and that even knowing this Gingold refused to repay the funds. *Id.* Construing all reasonable inferences in favor of the plaintiff, a reasonable jury could apply the restatement factors above to find that Gingold utilized improper means to interfere with the BRDF's repayment of the Grant Agreements. The Court denies Gingold's motion in this respect.[16]

### C. Failure to State a Claim: Count VI – Aiding and Abetting Breach of Fiduciary Duty

Gingold next asks the Court to dismiss the Foundation's aiding and abetting claim. He argues that the District of Columbia does not recognize the tort of aiding and abetting. While, it is true that the District of Columbia Court of Appeals has never expressly decided whether a cause of action exists for aiding and abetting the breach of a fiduciary duty, courts applying District of Columbia law have nonetheless found aiders and abettors liable for the underlying tort when certain criteria are met. *See Chen v. Bell-Smith*, 768 F. Supp. 2d 121, 140–41 (D.D.C. 2011). Those actors are liable when: (1) they assist "the primary violator in performing a wrongful act that causes an injury;" (2) they are "generally aware of [their] role as part of an

---

[16] The Court notes that both parties recognize that this count is brought as an alternative to the breach of contract counts.

overall illegal or tortious activity at the time [they] provides the assistance; and (3)" they "knowingly and substantially assist[] the principal violation." *Id.* (quotations and citations omitted). Gingold has not challenged the sufficiency of the underlying allegations and the Court will not address them *sua sponte* here. Gingold's motion is denied.

### D. Failure to State a Claim: Count VII – Unjust Enrichment

Gingold also asserts that the Foundation has failed to state a claim for unjust enrichment. To state a claim for unjust enrichment, a plaintiff must establish that: "(1) they conferred a legally cognizable benefit upon defendants; (2) defendants possessed an appreciation or knowledge of the benefit; and (3) defendants accepted or retained the benefit under inequitable circumstances." *Oceanic Expl. Co. v. ConocoPhillips, Inc.*, 2006 WL 2711527, at *20 (D.D.C. Sept. 21, 2006). Gingold challenges the Foundation's allegations as to elements one and three.

The Foundation has sufficiently alleged that it conferred a legally cognizable benefit on Gingold. The Restatement (First) of Restitution provides further insight into what constitutes a benefit.

> *What constitutes a benefit.* A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. *He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss.* The word "benefit," therefore, denotes any form of advantage. The advantage for which a person ordinarily must pay is pecuniary advantage; it is not, however, necessarily so limited, as where a physician attends an insensible person who is saved subsequent pain or who receives thereby a greater chance of living.

Restatement (First) of Restitution § 1, cmnt. b (1937) (emphasis supplied). Specifically, the Foundation alleges that it provided more than $6.425 million in refundable grant monies to assist in the *Cobell* litigation. Compl. ¶ 118. That money went to pay for the services of an accounting firm, experts, and to fund a nationwide outreach campaign. *Id.* Additionally, the Foundation

alleges that in 2006 Gingold acknowledged that the Foundation's support was "critical to meet the financial demands of plaintiffs' experts whose skills were necessary for plaintiffs to prevail" in an earlier phase of the proceedings. *Id.* ¶ 44. Of course, the Foundation also alleges that Gingold was enriched by millions of dollars through his participation in the $99,000,000 attorneys' fees award that accompanied the settlement. *Id.* ¶ 119. Such allegations support the conclusion that Gingold both indirectly profited from the Foundation's grants through the success of the overall litigation and also directly saved money by not having to potentially pay for certain litigation expenses.

The Court also finds unpersuasive Gingold's argument that the Foundation cannot show that his retention of the attorneys' fee was unjust. The Complaint alleges that "It would be against equity and good conscience to permit Defendants to accept the substantial financial benefits of the Foundation's support of the Indian Trust Fund Litigation, but disclaim their promises and obligation to facilitate repayment to the Foundation from funds acquired directly through the success of that litigation." Compl. ¶ 120. At the pleading stage, these allegations are sufficient to survive Gingold's motion to dismiss. *See McWilliams Ballard, Inc. v. Level 2 Dev.,* 697 F.Supp.2d 101, 107 (D.D.C. 2010) (plaintiff properly stated a claim of unjust enrichment by merely alleging that the retention of the conferred benefit was "unjust, unfair, and inequitable," despite offering "no specific allegations" as to the unjust nature of the retention) (citation and quotation marks omitted); *also JSC Transmashholding v. Miller,* 70 F. Supp. 3d 516, 523 (D.D.C. 2014) (same). The Court denies Gingold's Motion to Dismiss in this respect.

## IV.    <u>Declaratory Judgment</u>

Gingold asks the Court to dismiss Count I of the Complaint on the ground that the request for a declaratory judgment "is identical to the Foundation's breach of contract claims" and, as

such, "constitutes an unnecessary, duplicative count." Mot. to Dismiss at 8 [ECF No. 20]. The Court agrees and will dismiss the count.

The Foundation seeks a declaratory judgment "that Defendants are required by the terms of the seven grant agreements to pay or ensure collective payment by class counsel of $4,540,607.72 to the BRDF for purposes of repaying the Foundation." Compl. ¶ 78. Under 28 U.S.C. § 2201 the Court "*may* declare the rights and other legal relations of any interested party seeking such a declaration" after it finds that a "case or controversy exists." (emphasis supplied). While a "case or controversy" exists here, the Court nonetheless exercises its discretion and declines to hear the claim.

The issues the Foundation seeks to resolve through the declaratory judgment claim are duplicative of those addressed by the breach of contract claims and would therefore not serve a useful purpose. *See Gibson v. Liberty Mut. Grp., Inc.*, 778 F. Supp. 2d 75, 79 (D.D.C. 2011) (noting that a court may decline to hear a declaratory judgment count when it would fail to serve a useful purpose because an existing breach of contract claim would resolve the same issues). The dispute between the parties will be more completely resolved by the breach of contract and breach of fiduciary duty claims. Those claims necessarily involve interpretation of the Grant Agreements and the parties' relationships, but also provide the ability for the plaintiff to recover damages, if any. The Court grants Gingold's motion in this respect and the declaratory judgment count is dismissed with prejudice.

**V.    The Foundation's Motion For Leave to File Supplemental Complaint and the Assignability of Breach of Fiduciary Duty Claims in the District of Columbia**

Finally, the Court will address the Foundation's Motion for Leave to File Supplemental Complaint as well as Gingold's remaining futility arguments. The Foundation moves for leave to incorporate "transaction[s], occurrence[s], or event[s] that happened after the date of the pleading

41

to be supplemented." Fed. R. Civ. P. 15(d). The Foundation's supplemental complaint simply incorporates one additional paragraph nothing that the Foundation and the BRDF entered into an Amendment to Assignments Agreement changing their choice of law to the District of Columbia. Suppl. Compl. ¶ 71. No new claims are added.

Nonetheless, Gingold asserts that the Foundation's breach of fiduciary duty claims are not assignable because, 1) the District of Columbia does not recognize the wholesale assignment of fiduciary rights, and 2) claims asserting breach of fiduciary duty are not transferable between parties with "conflicting interests."[17] Gingold opposes the Foundation's motion in this respect, but fails to carry his burden in demonstrating why leave should not be granted due to futility. Instead of presenting an affirmative argument, Gingold attempts to distinguish the Foundation's cited authority. Ultimately, Gingold's argument appears to reflect a view that the public policy concerns attendant to the legality of assigning legal malpractice claims should make the assignment of this specific breach of fiduciary duty claim unlawful. The Court does not agree and holds that the facts as alleged support a finding that the Foundation may bring its assigned breach of fiduciary duty claim.

The Court begins its analysis with the overarching principle that "District of Columbia law evinces a policy of free assignability of claims." *Antal's Rest., Inc. v. Lumbermen's Mut. Cas. Co.*, 680 A.2d 1386, 1388 (D.C. 1996) (citing D.C. Code § 28-2304) (quotation marks

---

[17] Gingold also argues that the Foundation cannot assert a claim against the fee award for breach of fiduciary duty because such a claim is not actionable "unless injury accrues to the beneficiary or the fiduciary profits thereby," and neither the class was injured, nor did Gingold profit from the alleged breach. Opp'n at 11 [ECF No. 32] (quoting *Randolf v. ING Life Ins. and Annuity Co.*, 973 A.2d 702, 709 (D.C. 2009)). As the Court has held above that the Foundation has adequately pleaded that it was injured and Gingold profited from the retention of fees that would otherwise have paid back to the Foundation, the Foundation's claim survives.

omitted); *see also Caglioti v. Dist. Hosp. Partners, Lp*, 933 A.2d 800, 812 (D.C. 2007) (same).

Indeed, the District of Columbia Court of Appeals has noted that there is a "general aversion of

the law to limitations on the free assignability of claims." *Antal's,* 680 A.2d at 1388 (D.C. 1996).

The District of Columbia's "preference for free assignability of claims" is such that the D.C.

Court of Appeals has gone so far as to say "[t]he right to assign is presumed, based upon

principles of unhampered transferability of property rights and of business convenience."

*Caglioti*, 933 A.2d 800, 812 (D.C. 2007) (citations omitted).

Neither the District of Columbia courts nor the courts in this Circuit have addressed the

enforceability of an assigned a breach of fiduciary duty claim against a former attorney. The

Court, instead, must rely on somewhat analogous legal malpractice authority to address this

issue. The parties cite to *Edens Techs., LLC v. Kile Goekjian Reed & McManus, PLLC*, 675 F.

Supp. 2d 75 (D.D.C. 2009) and *Richter v. Analex Corp.*, 940 F. Supp. 353 (D.D.C. 1996), as well

as other persuasive authority, to make their cases. Gingold argues that *Edens* supports a

conclusion that "overriding public policy concerns render these types of assignments invalid."

Opp'n at 5 [ECF No. 32] (quoting *Edens,* 675 F. Supp. 2d at 79). The issue and "type[] of

assignment[]" in *Edens*, however, was specifically identified by Judge Huvelle as "not whether

legal malpractice claims can be assigned, but rather, whether a company can assign its legal

malpractice claim to a former litigation adversary as a part of the settlement of that litigation."

*Edens*, 675 F. Supp. 2d at 79.

In ruling that public policy prevents the assignment of the claim presented in *Edens*, the

court focused on two main policy implications, the "most compelling" being that such an

assignment "creates the opportunity and incentive for collusion in stipulating to damages in

exchange for an agreement not to execute on the judgment in the underlying litigation." *Edens*,

675 F. Supp. 2d at 79 (quoting *Gurski v. Rosenblum & Filan, LLC*, 276 Conn. 257, 278 (2005)). Since the "losing" party in such a consent judgment knows it will never have to pay the "winner," neither party is prevented from stipulating to inflated damages to drive up the potential damages in the malpractice action. *Edens,* 675 F. Supp. 2d at 79. The second policy implication the court highlighted in *Edens* is the "illogic" of attorneys or parties arguing inconsistent positions in two separate actions based on identical facts. *Id.* at 80. "[T]his abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth." *Id.* (quoting *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 318 (Tex. App. 1994), *writ refused* (Dec. 1, 1994)).

Neither of these policy concerns are implicated here.[18] There is no underlying litigation requiring the Foundation to take a position. While it is true that Gingold petitioned the Court on behalf of the *Cobell* Representatives to award them costs or expenses which would cover the repayment of the grants to the Foundation, (Plaintiffs' Memorandum in Support of Class Representatives' Petition for Incentive Awards and Expenses, *Cobell,* 1:96-cv-1285 (D.D.C. Jan 25, 2011) ECF No. 3679) the *Cobell* Representatives' position there is not contradictory to the Foundation's claims here.[19] The Foundation, through the *Cobell* Representatives and the BRDF, has multiple avenues to pursue repayment of the Grant Agreements – "attorney's fees and/or

---

[18] Of course, because this action is not one for malpractice, considerations regarding the potential creation of a "marketplace" for malpractice actions are not implicated. The claim for breach of fiduciary duty is limited to the pecuniary interest of class plaintiffs, not their relationship or confidences expressed to former counsel.  The adequacy of Gingold's representation of his clients with respect to their legal claims in the *Cobell* case is not questioned here.

[19] That issue remains undecided on remand from the Court of Appeals.

costs, and/or expenses" awarded in settlement. Further, as no litigation was initiated, and the outstanding balance of the debt owed is not contingent on any agreement between parties, but is simply a firm number, there is no risk or specter of collusion in settlement or assignment.[20]

The Court is compelled to follow the rationale presented in *Richter*. There, after an attorney brought tort and contract claims against the purchaser of some of a corporation's assets and liabilities, the purchaser counterclaimed for legal malpractice. *Richter*, 940 F. Supp. 353, 355-56 (D.D.C. 1996). The attorney moved to dismiss the purchaser's counterclaim. *Id.* The court first cast aside those cases barring the assignment of legal malpractice claims due to concerns over "the fear that parties will sell off claims, particularly to opponents or completely unrelated third parties, and … jeopardizing the personal nature of legal services" because they relied on factors not present there. *Id.* at 357 (citations omitted). Instead, the *Richter* court denied the motion to dismiss and focused on two factors: 1) that the claim was not assigned to an unrelated third party, but rather a corporation with liabilities alleged to have been caused by the counter-defendant's conduct; and 2) that the interests involved were pecuniary in nature and "do not implicate the kinds of concerns raised by the sale or assignment of a personal injury claim." *Id.* at 358.

The Court follows *Richter* and will permit this action based on the following considerations. "District of Columbia law evinces a policy of free assignability of claims." *Antal's*, 680 A.2d at 1388 (D.C. 1996). The claim assigned here is brought by an obviously related party, the Foundation, the same party that the *Cobell* plaintiffs intended to protect with their 1998 assignment to the BRDF. Of course, the Foundation has also brought related contract

---

[20] Similarly, the Court is not persuaded that this assignment should be deemed unenforceable because the BRDF and the Foundation *might be* adversaries in the future. Opp'n at 9-11 [ECF No. 32].

claims (discussed above) based on the same contract. Moreover, the claim is not for legal malpractice, but rather a breach of fiduciary duty based on concrete, pecuniary loss allegations. Finally, there is no specter of collusion or improper shift in positions among the assigning parties. The Court finds that the District's preference for free assignability carries the day and is not persuaded by policy concerns raised by malpractice assignments not implicated here.

Ultimately, as the Court has denied Gingold's Motion to Dismiss in all respects, save for Count I, the Foundation's supplemental complaint would not be futile and its Motion for Leave to File Supplemental Complaint shall be granted.

## CONCLUSION

For the reasons stated above, the Court denies defendant's Motion to Dismiss in part and grants it in part and grants the Plaintiff's Motion for Leave to File Supplemental Complaint. An accompanying order will follow.

October 25, 2017

_____
Thomas F. Hogan
Senior United States District Judge